**Mary Ruth DYESS, Appellant,**

v.

**CONNECTICUT GENERAL LIFE INSURANCE COMPANY, Appellee.**

No. 17430.

Court of Civil Appeals of Texas,
Dallas.

April 17, 1970.

Rehearing Denied June 5, 1970.

Elihu Berwald, Rosenfield, Berwald & Mittenthal, Dallas, for appellant.

H. T. Bowyer, William W. Sweet, Jr., Bowyer, Thomas & Sweet, Dallas, for appellee.

CLAUDE WILLIAMS, Justice.

Connecticut General Life Insurance Company issued its "Group Accidental Death" insurance policy insuring the life of J. F. Dyess and naming his wife, Mary Ruth Dyess, as beneficiary. The policy contained a provision that upon receipt by the insurance company of due proof that J. F. Dyess had received an accidental bodily injury, and as a result of the injury, directly and independently of all other causes, had suffered loss of life within 90 days after the date of such injury and that such loss did not result from any of the risks excepted, the insurance company agreed to pay Mrs. Dyess, the beneficiary, the sum of $20,000. One of the risks excepted by the terms of the policy was: "1. suicide or intentionally self-inflicted injury, while sane or insane."

Mary Ruth Dyess brought this action against Connecticut General Life Insurance Company alleging that on October 10, 1967 J. F. Dyess sustained bodily injuries caused solely by accident in the nature of a gunshot wound in the chest; that within 90 days after the date on which the injury was received, and on the same day, October 10, 1967, as a direct result of such bodily injuries, directly and independently of all other causes, F. J. Dyess died. Mrs. Dyess sought judgment for the sum of $20,000, together with penalty, attorney's fees and interest.

Connecticut General Life Insurance Company answered with a general denial and a special plea that the death of Dyess was the result of an intentionally self-inflicted injury by gunshot and was not an accidental death, and by reason of the exception contained in the policy no recovery should be allowed.

The case proceeded to trial before the court and a jury and in response to special issues submitted the jury found (1) that Dyess' death resulted directly and independently of all other causes from accidental bodily injury; (2) that the death of Dyess did not result directly or indirectly from suicide; and (3) that the death of Dyess did not result directly or indirectly from an intentionally self-inflicted injury.

The trial court overruled Mrs. Dyess' motion for judgment based upon the verdict and sustained a motion for judgment *non obstante veredicto* filed by Connecticut General Life Insurance Company and rendered judgment that Mrs. Dyess take nothing by her action. The judgment is now before us on appeal.

In four points of error appellant asserts that there was evidence of probative value to support each finding of the jury and therefore the trial court committed error in disregarding the jury's answer to each of said special issues and in rendering

judgment for appellee *non obstante veredicto*. To resolve this vital question we are enjoined by our Supreme Court to consider only the evidence and the reasonable inferences therefrom which support the answers of the jury. C. & R. Transport, Inc. v. Campbell, 406 S.W.2d 191 (Tex.Sup. 1966).

The paramount question is thus presented: Does a correct judicial review of the record here presented demonstrate that Mrs. Dyess discharged the burden resting upon her to prove by a preponderance of the probative evidence that Mr. Dyess suffered an accidental bodily injury which "independently of all other causes" produced his death? Combined American Insurance Co. v. Blanton, 163 Tex. 225, 353 S.W.2d 847 (1962); International Traveler's Ass'n v. Francis, 119 Tex. 1, 23 S.W. 2d 282 (1930); and Republic Nat. Life Ins. Co. v. Hamilton, 373 S.W.2d 275 (Tex.Civ. App., San Antonio 1963, writ ref'd n. r. e.).

We have carefully reviewed the entire statement of facts, consisting of 1071 pages, and also numerous documents and other physical instruments. It would unduly lengthen this opinion to summarize all of the record but we consider the following to be a fair summarization of the material testimony upon which the resolution of the question must be based.

J. F. Dyess and his wife Mary Ruth resided in Garland, Texas. They had been married since 1951 and had two sons, Joel, age 16, and Jeffrey, age 11. Mrs. Dyess had been previously married and had a son by that marriage, Michael, age 20. Mr. Dyess had adopted Michael. Mrs. Dyess was employed at Texas Instruments and Mr. Dyess had been employed for twelve or fifteen years as a maintenance man by Gaylord Container Company.

Mrs. Dyess testified that she and her husband had no marital problems of any consequence though she admitted she had filed a petition for divorce against Mr. Dyess in 1965. The suit was dismissed for want of prosecution in 1966.

During his lifetime J. F. Dyess was interested in hunting and fishing as a hobby. He owned several guns, including the automatic 12 gauge shotgun which ultimately caused his death. It was shown that he was thoroughly familiar with the use of his guns and was extremely careful, exercising every precaution to see that they were safely used. Mrs. Dyess testified that her husband practiced safety and precaution when he hunted; that he instructed the children in safety methods. She said:

"Q And isn't it true that he always unloaded his gun—

A He taught the children—

Q —when he finished hunting?

A He taught the children to unload the gun at the time they went hunting before they ever got into the car or the pick-up. They loaded the gun after they got to the woods and they unloaded the gun before they left.

Q And he did the same, did he not?

A Yes sir.

Q And he didn't ever bring a loaded gun in the house?

A Not that I know of.

Q Now, when they finished hunting and brought their guns home, it was their practice to clean them at that time, wasn't it?

A Yes, if possible.

Q He instructed them to always clean their gun when they finished hunting?

A Yes.

Q Then, when they would go hunting again, then the guns were ready to go, is that correct?

A Well, they normally checked them over, dusted them, but then, they cleaned them when they came from hunting. Then, he had them to check them before they left again."

Concerning Dyess' physical and mental condition the record reveals that he had a history of mental disorder which began in February of 1966 at which time he was depressed and cried. His family physician, Dr. Campbell, prescribed a drug called etrafon, which is used for emotional problems, and referred him to a psychiatrist, Dr. Timken, for further treatment. He was seen several times by the doctors until June 1966 during which time he had troublesome ideas of "eminent wealth and eminent heavenly glory, etc." He was next seen in Dr. Campbell's office on February 2, 1967 at which time he was "overtly psychotic" and was referred to Beverly Hills Hospital at Dallas, where he was admitted under the supervision of Dr. Speegle, a psychiatrist, and was placed on tranquilizers consisting of mellaril and a combined therapy program of electroshock treatments and deep insulin coma therapy. At that time he was diagnosed as having "schizophrenic reaction—paranoid type." He was suffering from hallucinations and delusions, was depressed, jealous, and "readily admitted to suicidal ideas." He gave a history of mental illness in his family in that his father, sister and half sister had been admitted to mental institutions. Concerning suicidal tendencies, Dr. Speegle testified:

"Q Did he at that time do or say anything which would cause you to believe that he had any suicidal tendencies?

A He stated that he had thought of committing suicide.

Q Do you consider that significant?

A We always take these things very seriously."

Dr. Speegle testified that Mr. Dyess was a very sick man; that he stayed in Beverly Hills Hospital until April 6, 1967, and during this period he received a series of thirty-seven insulin injections resulting in thirty comas and twenty-one electroshock treatments. He was given various drugs including 200 milligrams of mellaril and was discharged with a prognosis of "guarded" and was advised to continue using 200 milligrams of mellaril in the evening and continued electroshock treatments on an outpatient basis. Dr. Speegle testified that when Mr. Dyess was discharged he was "in complete remission of symptoms." He did not consider him to be "cured" or "well" in the lay sense of the word because a patient may have recurrence of the illness. After Dyess was discharged from Beverly Hills Hospital on April 6, 1967 he worked at Gaylord Container Corporation one week and then during May, June and July of 1967 he was physically disabled due to a lung infection and a swollen gland in his neck which received surgical procedure. He was in the hospital on two occasions during that time. He did not return to Beverly Hills Hospital for the electroshock treatments prescribed. He returned to his work during the week of August 13, 1967.

On October 9, 1967, the day before his death, Mr. Dyess came to Dr. Campbell's office, with his wife, complaining of fatigue, weight loss, loss of appetite and nervousness. Dr. Campbell said at that time that he seemed "ill at ease again" and that he suspected that Mr. Dyess was suffering from depression. He asked Dyess whether he had suicidal ideas but Dyess denied that he had. Dr. Campbell prescribed 200 milligrams of mellaril, together with 50 milligrams of a drug called elavil. Dr. Campbell admitted that in assessing the degree of depression which Mr. Dyess had at that time he relied solely on what Dyess had told him. He further stated that psychiatrists do not rely solely on what the patient tells them but look deeper into the situation and decide whether a person is seriously depressed even though he denies it. He said the drug given was a tranquilizer and used to "relax tension and relieve anxiety."

On the morning of October 10, 1967 Mrs. Dyess testified that she left to go to work but that her husband did not go to his work. She said that he decided to take that week off as a vacation; that he called his fore-

man and told him he was going to take off that week. She said he had plans to go hunting at Pittsburg, Texas the next day, Wednesday, October 11, and that he further planned to go to Lubbock, Texas the following Saturday to visit Michael who was attending Texas Tech. She said her husband appeared to be all right in every way at the time she left the house that morning. She telephoned the house about 3:00 p. m. at which time Mr. Dyess answered the phone and said that he had been awakened by the call. In the conversation she asked her husband to cook the evening meal because some friends were coming over later that evening to play dominoes. After the phone call, Mr. Dyess was seen and observed by his son Jeffrey who had returned home from school about 3:30 p. m. Jeffrey said that when he arrived home his father was vacuuming the floor of the living room and that he greeted him in the usual manner. Jeffrey remained home until he left to go to football practice. When Jeffrey left about 4:30 p. m. his father was sitting down in the reclining chair in the living room reading a newspaper and had removed his shoes. Jeffrey told his father he was going to football practice and his father offered to drive him there but Jeffrey declined, saying he would ride his bike.

At approximately 5:15 p. m. on October 10, 1967, Mrs. Dyess came home and discovered her husband lying on his back on the floor of the den and his 12 gauge shotgun was lying across his left arm. He was wearing trousers and shirt and did not have on shoes. It is undisputed that J. F. Dyess died some time between 4:45 p. m. and 5:15 p. m. on Tuesday, October 10, 1967, of gunshot wounds in the chest inflicted by the 12 gauge semi-automatic shotgun. At the time the shotgun was discharged the end of the barrel was either touching the chest of Dyess or was held in a position in close proximity thereto. The detective who investigated the shooting said the wound was "just below and just a little bit right of the left titty"; that it was about the size of or

a little larger than a quarter and that it was a "contact wound" because of the gunpowder on the shirt. When the body was discovered there was one empty shell from the gun lying on the floor near the gun and there were no other shells in the gun.

Sergeant Sullivan of the Garland Police Department investigated the matter. When he arrived at the Dyess home he talked with Mrs. Dyess who told him that Mr. Dyess had taken off from work that day "because he was feeling bad." He said that nothing in the house was out of order and that there was nothing to indicate that Mr. Dyess had been cleaning his gun.

Justice of the Peace Ward made his investigation at the residence and prepared and filed the death certificate in which it was recited that Dyess died as a result of "self-inflicted gunshot wound of chest" and that his death was caused by suicide. Certified copy of the death certificate was in evidence.

The original proof of death sent to the insurance company by attorneys for Mrs. Dyess contained a statement signed by Dr. Bayoud which recited the cause of death as "gunshot wound in the chest—cause unknown."

About two weeks before his death, or about Sunday, September 24, 1967, Mr. Dyess went hunting in East Texas accompanied by his son Michael and his son Joel. What took place on this trip was testified to by both Michael and Joel. Michael said that he and Joel went down to East Texas on Saturday and took with them three guns, the 12 gauge, the .410 and the 22. Mr. and Mrs. Dyess drove down Saturday night and the next morning Dyess, Michael and Joel went hunting, accompanied with their uncle. They hunted all morning, Mr. Dyess using his 12 gauge automatic, and then the party returned to the uncle's house to eat lunch. After lunch Michael and Joel went back hunting and this time Mr. Dyess let Michael use the 12 gauge gun and Joel use the .410. He said on this occasion he fired the gun four times. The magazine

of the gun would hold three shells. He shot three times and then loaded the gun again with three shells. He shot the fourth time and then a shell jammed in the gun. He said he pulled the trigger several times trying to get the gun to fire but it would not go off. Michael said that he tried to pry the shell out with a small pocket knife but was unsuccessful in doing so. He was successful in taking the remaining shell out of the magazine, leaving the jammed shell in the gun barrel. He then closed the bolt of the gun, put it on "safety", and put the gun in its case and then put the gun and case in the back of the truck. He did not mention anything about the shell being jammed in the gun to his father. The family returned home the next day. Michael said that upon arriving at home he removed the 12 gauge shotgun from the truck and put it back in the living room closet where it was usually kept. He said he left the following morning to return to Lubbock to attend school at Texas Tech and still did not tell his father about the shell being lodged in the gun before he left. The reason he did not tell his father was because he did not want to incur his wrath or ire. Joel testified to facts in support of those testified to by Michael concerning the hunting trip and the jamming of the shell, together with efforts made by Michael to remove the shell from the barrel. Joel said that when the family got home the shotgun was returned to the closet in the living room. After Michael went back to school and about two days later he told his father about the incident and that Mr. Dyess "wasn't happy" about the situation. Dyess told Joel that he would "check the gun." Joel never did see his father do anything to the gun up to the date of his father's death.

The record is entirely devoid of any direct evidence as to exactly what transpired following the time the son left to go to football practice and the time of Mr. Dyess' death. Evidence was introduced to show that the gun could have been fired by Mr. Dyess by pressing the trigger with either his finger or with one of his toes.

The 12 gauge shotgun which killed Mr. Dyess was voluntarily turned over by appellant to a gun expert, Mr. Johnny Otts. He testified that he made an examination of the gun and prepared a report, in writing, which was furnished to attorney for appellant. In such report he said that when the trigger was removed from the gun that a "deformed lead shot, approximately .091 inches" in diameter fell out when the trigger was removed. The report from Otts contained no other conclusion concerning the lead shot.

The shotgun was then examined by another gun expert, Mr. Clement Miller, at the request of appellant. Miller said he examined the gun twice. The first time he did not find anything wrong with it. On that occasion he did not disassemble the action but took the barrel out to see the general condition of it. The second time he examined the gun he had been apprised of Mr. Otts' report and had been given the lead shot which Otts had reported to have fallen out of the mechanism of the gun. Miller testified that on his second examination he removed the trigger mechanism to make an experiment with the lead pellet or shot to determine whether or not the shot or pellet could have caused the gun to discharge accidentally. He said he placed the pellet under the sear, a part of the mechanism in the trigger device, and after trying it in various positions under the sear he finally did find a place where it would engage the hammer so that a jar, or several jars, could set it off. In this connection he said:

"Q What experiment did you make?

A I placed the pellet under the sear to see how this would interfere with the sear catching the hammer.

Q Did the pellet after you—Go ahead, I'm sorry.

A After trying it in various positions under the sear, I did find a place where

it would engage the hammer, but—a jar or several jars could set it off. It could allow the hammer to fall.

Q In other words, is it your testimony that the pellet, you placed the pellet in such a position in the trigger assembly that had the gun received a blow of any kind from being dropped or otherwise, the trigger would go off and explode the gun if there was a shell in it?

\* \* \* \* \* \*

A Well, it could either be one blow or it could be several blows. But, that's generally what I said, yes sir.

Q Mr. Miller, have you had occasion to observe guns go off under circumstances like that with a pellet being jammed in the trigger assembly?

A I cannot recall one having a pellet jammed in the assembly. There has been other foreign matter jammed in the assembly that would cause that to happen, yes sir."

He testified that if a foreign substance gets in the trigger assembly it does create a dangerous situation if there is a live shell in the gun. He then testified:

"Q Now, assuming that there was a gun, a live shell that was jammed in this gun and assuming that the pellet was in the position that you placed it in when you made your experiment in your shop and here in the courtroom today and a blow was struck on the butt of that gun from dropping, it having been dropped or otherwise, keeping in mind that the shell was jammed in the gun, would that dropping or that blow or is it reasonably probable that that dropping or that blow would cause the trigger to fire the gun and explode it?

A Yes sir.

Q How would you account for that if the, the shell was jammed in the gun?

A Well, it would probably be chambered. If it wasn't fully chambered, it wouldn't go off. The hammer would probably fall, but it wouldn't go off. If it was fully chambered, it would go off if the hammer fell.

Q Could the blow cause the shell to fall into proper place?

A Well, yes sir, if there was a shell jammed in this chamber and when you pull the bolt back, these automatics have very weak extractor springs. If a shell is jammed in the chamber very hard, the extractor will just slip off this brass portion of the shell and won't pull it. However, by pulling this back and releasing it, the battering of the bolt hitting it the first time, the second time or the 20th time would slowly fully chamber the shell."

Mr. Miller testified that he examined the butt plate of the gun and found what appeared to be a flat triangular dent. He said:

"Q Does that, what does that indicate to you with respect to what might have happened to the gun?

A Well, this gun had been either dealt a sharp blow or dropped on the butt."

Mr. Otts testified that if the lead pellet or lead shot had gotten hung under the sear it could cause it to fire, assuming it was cocked. However, he had never seen it happen to a gun of that particular model.

Appellant, conceding that it was her burden to establish by competent evidence proof that the death of her husband was caused by bodily injuries within the terms of the policy, contends that she has met that burden by producing evidence, albeit circumstantial, which was sufficient to justify the submission to and the answer of the jury to the special issues submitted. Her contention must stand or fall upon the theory advanced by the witness Miller that the gun accidentally discharged by a fall or jar while Dyess was engaged in an effort to dislodge a shell from the gun. A careful analysis of the testimony con-

vinces us that Mrs. Dyess has failed to meet the burden imposed on her by law to produce competent evidence, more than a surmise or suspicion, to establish the material element of her cause of action.

There is no direct evidence in this case as to what actually happened to cause Mr. Dyess' death. Our Supreme Court has announced several times that while proof of an ultimate fact by other relevant facts and circumstances may sometimes be so conclusive even in the absence of direct evidence as to compel a finding of its existence as a matter of law, this will be true only where reasonable minds might not differ as to the inference to be drawn. Cavanaugh v. Davis, 149 Tex. 573, 235 S.W.2d 972 (1951); Gulf Oil Corporation v. Marathon Oil Co., 137 Tex. 59, 152 S.W.2d 711 (1941); and Commercial Standard Ins. Co. v. Davis, 134 Tex. 487, 137 S.W.2d 1 (1940). Again, the Supreme Court while reiterating the rule that an ultimate fact may be conclusively shown by wholly circumstantial evidence, pointed out that such circumstantial evidence must constitute more than a mere surmise, suspicion or scintilla. Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059 (1898).

In 1889 our Supreme Court, speaking through Mr. Justice Gaines, said that while proof of an ultimate issue may be established by circumstances such circumstances themselves must be shown by direct evidence and cannot be inferred from other circumstances. He said: "It is not admissible to go into the domain of conjecture, and to pile one presumption upon another." Missouri Pac. Ry. Co. v. Porter, 73 Tex. 304, 11 S.W. 324, 326 (1889). Later, in 1914, the Supreme Court, speaking through Chief Justice Brown, said: "A presumption of fact cannot rest upon a fact presumed. The fact relied upon to support the presumption must be proved. 'No inference of fact should be drawn from the premises which are uncertain. Facts upon which an inference may legitimately rest must be established by direct evidence, as if they were the facts in issue. One presumption cannot be based upon another presumption.'" Ft. Worth Belt Ry. Co. v. Jones, 106 Tex. 345, 166 S.W. 1130, 1132 (1914). The same thing was said by Justice Smith speaking for the Supreme Court in Rounsaville v. Bullard, 154 Tex. 260, 276 S.W.2d 791 (1955). Later, in 1968 Mr. Justice Norvell speaking for the Supreme Court in Texas Sling Co. v. Emanuel, 431 S.W.2d 538 (Tex., 1968), reiterated these well established rules condemning the piling of one presumption upon another.

In Continental Casualty Co. v. Fountain, 257 S.W.2d 338 (Tex. Civ.App., Dallas 1953, writ ref'd), Chief Justice Dixon, speaking for this court, analyzed the testimony given in a very similar case involving the question of accidental death. Speaking concerning the character of testimony required, he pointed out that neither expert witnesses nor the jurors may be turned loose in the domain of conjecture as to what may by possibility ensue from a given statement of facts. He said:

"It will be observed that nowhere in the record is there any direct testimony that the accident was the sole cause of the death of James M. Fountain. We are mindful that the cause of death may sometimes be inferred from circumstances. However in the case at bar in order to reach any such conclusion we must base an inference upon an inference. * * * This process of piling one inference upon another is not permitted under the law. Wells v. Texas Pac. Coal & Oil Co., 140 Tex. 2, 164 S.W.2d 660; American Casualty & Life Co. v. Morrison, Tex.Civ. App., 161 S.W.2d 796; Brown v. Maryland Casualty Co., 8 Cir., 55 F.2d 159."

Chief Justice Dixon further said:

"The burden of proof was upon her. True, she was entitled to such favorable inferences as reasonable men might fairly draw from the testimony, but such inferences must be based upon facts and not upon other inferences. * * * nor can a jury be permitted to base a verdict up-

on mere guess or surmise." (Brown v. Maryland Casualty Co., supra, at p. 161).

In Prudential Ins. Co. of America v. Krayer, 366 S.W.2d 779 (Tex.Sup. 1963), the Supreme Court, in considering a circumstantial evidence case involving the cause of death of an insured, concluded that based upon such evidence the jury had to resort to pure fantasy and speculation in order to conclude that the insured died as a result of homicide. In Combined American Ins. Co. v. Blanton, 163 Tex. 225, 353 S.W.2d 847 (1962), the Supreme Court again considered the question of discharge of burden of proof in such cases and held that there was no evidence which would support a reasonable inference that Blanton's death was caused by accidental means.

■ The most recent pronouncement of the Supreme Court, again reaffirming the long established law that a presumption of fact cannot rest upon a fact presumed and that one presumption cannot be based upon another presumption, is East Texas Theatres, Inc. v. Rutledge, 453 S.W.2d 466, decided March 18, 1970.

Applying this well established law to the record here made it is quite obvious that for Mrs. Dyess to sustain her contention that her husband died of accidental means she must ask us to arrive at this conclusion following a number of presumptions based upon presumptions. In the first place we must presume that the same shell that was lodged in the gun barrel on the occasion of the hunting trip some two weeks before Dyess' death remained in the gun barrel until October 10, 1967. This presumption is inconsistent with appellant's testimony concerning the great care and caution ordinarily exercised by Dyess during his lifetime in the care of his weapon. Assuming this presumption, we must further presume or infer that on October 10, 1967 Dyess removed the gun from the case and proceeded to make an effort to eject the shell which had been lodged therein. We must then assume that the live shell in the gun barrel was fully chambered. We must go further

and speculate and conjecture that at that time the leaden pellet or shot had lodged exactly under the sear of the trigger mechanism as described by the witness Miller. We must go further and speculate and conjecture that at that very moment Dyess dropped the gun to the floor one or more times causing it to discharge. We must go further and speculate and conjecture that at that very moment Dyess' body was in such a position as to receive the force of the shell as it was fired from the gun barrel. None of these inferences or speculations' are supported by evidence. We must conclude, as did the Supreme Court in *Krayer,* supra, that the jury was required to resort to pure fantasy and speculation in order to conclude that Dyess' death was the result of accidental means. Certainly we cannot say that the record demonstrates only one reasonable hypothesis, to-wit, accidental death.

■ While there is a legal presumption against suicide, well recognized in law, this has been called a "true presumption" which "falls or disappears" when rebutted; that is to say, this presumption once rebutted does not have the weight as evidence. Combined American Ins. Co. v. Blanton, 163 Tex. 225, 353 S.W.2d 847 (1962); Prudential Ins. Co. of America v. Krayer, 366 S.W.2d 779 (Tex.Sup.1963). Appellee, through the medium of the verdict of the justice of the peace who conducted the official investigation following death, as well as the death certificate and other evidence, clearly overcomes the presumption against suicide. It is well established in our law that if there is no direct evidence as to the existence of an ultimate fact and the proven circumstances are consistent with either of two theories and there is nothing to show that one rather than the other probably is correct, then neither is proven. Worley v. International Travelers Assurance Co., 110 S.W.2d 1202 (Tex. Civ.App., Fort Worth 1937, writ dism'd); International Travelers' Ass'n v. Bettis, 120 Tex. 67, 35 S.W.2d 1040 (1931); Continental Casualty Co. v. Fountain, 257 S.W.

2d 338 (Tex.Civ.App., Dallas 1953, writ ref'd) ; and Republic Nat. Life Ins. Co. v. Bullard, 399 S.W.2d 376 (Tex.Civ.App., Houston 1966, writ ref'd n. r. e.).

■ Here the evidence concerning accidental death is inconclusive and lacks the necessary weight to amount to probative evidence to establish the ultimate fact. The circumstantial evidence, based upon proven facts, is as consistent with the theory of suicide as that of accidental death. Accordingly, Mrs. Dyess has failed to meet her burden.

Being firmly convinced that there is no evidence of probative force to support the answers of the jury to the special issues submitted we think that the trial court was correct in disregarding these answers and in rendering judgment that appellant take nothing from appellee. We therefore overrule all of appellant's points of error and affirm the judgment of the trial court.

Affirmed.