Adele L. LAMB et al., Appellants,

v.

SHELL CHEMICAL COMPANY et al., Appellees.

No. 15799.

Court of Civil Appeals of Texas, Houston (1st Dist.).

Feb. 3, 1972.

Rehearing Denied March 3, 1972.

for Robin Lamb, a minor, George D. Neal, Houston, for appellant.

Robert J. Malinak, Houston (Baker & Botts, Houston, of counsel), for appellee Shell Chemical Co.

Fulbright, Crooker & Jaworski, Jerry V. Walker, Rufus Wallingford, Houston, for appellee H. K. Ferguson Co.

Gerald P. Coley, Houston (Visnon, Elkins, Searls & Smith, Houston, of counsel), for appellee Fisk Electric Co.

COLEMAN, Justice.

This is a death action which arose from the death of Edward N. Lamb, and was brought by Adele L. Lamb, individually and as next friend for Robin L. Lamb, Mila Jean Lamb Thompson, joined by her husband, Kenneth D. Thompson, and as the community survivors of the Estate of Edward N. Lamb, Deceased, against Shell Chemical Company, a division of Shell Oil Company, Shell Oil Company, H. K. Ferguson Company, in which suit Shell sought contractual indemnity from H. K. Ferguson Company, and H. K. Ferguson Company plead for contractual indemnity against Fisk Electric Company, the employer of Edward N. Lamb at the time of the accident resulting in his death, and in which Liberty Mutual Insurance Company, the Workmen's Compensation Insurance Carrier for Fisk Electric Company intervened. This appeal is from an instructed verdict that plaintiffs take nothing against H. K. Ferguson Company and from a take nothing judgment entered upon the jury's verdict as to Shell Chemical Company and Shell Oil Company.

Edward Lamb died as the result of a fall from a ladder. The jury found that he sustained an electrical shock which caused him to fall. The jury answered, "We do not," to Special Issue No. 1, reading: "Do you find from a preponderance of the evidence that between 8:15 A.M. and 8:45 A. M. on the morning in question, Shell Chemical Company, acting through its offi-

Garrett & Letbetter, Tom R. Letbetter, George Payne, Mounger & Whittington; Rex C. Mounger, Houston, Atty. Ad Litem

cers, agents, servants, employees or trainees, turned on the switch that energized the alarm circuit?" Several groups of negligence issues predicated on an affirmative answer to Special Issue No. 1 were not answered. The jury failed to find Lamb guilty of any conduct constituting contributory negligence. Fisk Electric Company was found to be negligent in connecting the wire in question to the alarm panel circuit; that this negligence was a proximate cause of the occurrence, but not the sole proximate cause. The jury found that the occurrence was not an unavoidable accident, and found substantial damages.

Appellants contend that the answer made to Special Issue No. 1 is so contrary to the great weight and preponderance of the evidence as to be clearly wrong. A determination of this question requires that we consider all of the pertinent evidence.

Ferguson contracted with Shell to construct a chemical plant near Deer Park in Harris County, Texas. Fisk was an electrical subcontractor under Ferguson. There were five separate chemical processing and treatment areas in the Chlor/Alkali (C/A) unit of the plant. The accident resulting in Lamb's death occurred in the chlorine handling area of the C/A Unit on June 7, 1966. The contract provided for "phase work." As various areas or units were completed, they could be accepted by Shell so that the training of employees to operate the units could begin. Of the five chemical processing and treatment areas in the C/A Unit, only the brine treating area and the reagent preparation area had been accepted for operation by Shell prior to the accident. One control room operated the entire C/A Unit. Each of the five areas which made up the C/A Unit was controlled by a central electrical panel located in the control room. The control panel was made up of different segments which corresponded with the separate areas of the unit which were governed thereby. Shell accepted each segment of the control panel as it accepted for oper-

ation the corresponding area of the C/A Unit. The alarm panel was common to all of the five areas which made up the C/A Unit. Its function was to notify the operators in the control room of the location of an abnormal condition if such a condition should arise in the field.

The electrical power for the alarm panel was controlled by an enunciator switch on the back side of the control panel. This switch activated the alarm systems in all areas of the C/A Unit. Shell accepted control over this switch when it accepted the brine treating area for operation.

Lamb was installing electrical conduit in an area which had not been turned over to Shell at the time he was shocked. He would not have been shocked if the alarm circuit wire, near which he was working, had not been terminated in the alarm panel. There was no necessity for that wire to have been terminated while work continued in the area and it was not customary procedure to have live wires in areas where new construction was proceeding. Lamb's co-worker did not know that the wire to the alarm system in the area where they were working had been terminated into the alarm panel. On the date of the accident a number of Shell operators were at work in the control room. While they were experienced operators, they were being trained to operate this particular system. Their supervisor was not in the room at the time of the accident. They reported for work at 7:30 A.M. George Brantley, a Fisk employee, arrived at work at about 8:15 A.M. He testified that the alarm panel lights were not on at that time. Brantley, James Vestal, and a Ferguson employee were the only persons in the control room at that time except for the Shell employees. None of the Shell trainees were called as witnesses.

There is testimony that both before and after the date of the accident Ferguson employees and employees of its subcontractors were in and out of the control room and that the Fisk employees were working on

the control panels. Brantley testified that he did not see or hear anyone enter or leave the room after he arrived and before the accident. He acknowledged that he was not in a position to see at least part of the time and that it was possible someone else did enter the room. The only people he had ever seen turn on or off the alarm system were either Shell or Fisk employees and no one else ever had a reason to do so. Vestal testified that from the position where he and Brantley were working Brantley could not see the doors. He also testified that because of the detailed nature of the work he was doing, he was concentrating on the work and was not aware of who was coming and going.

Vestal assigned jobs to the electricians. He saw Lamb and Lannon in the dressing shack the morning of the accident and walked to the work site with them. They did not go to the control room before going to their work area. He did not mention assigning anyone else to work on that morning. The men who had not finished assigned jobs would continue on them and would go directly to the work area. No electricians other than Vestal and Brantley were working in the control room. Vestal testified that an electrician might have come to the control room that morning for information or supplies, but that he didn't remember whether one did or not. His desk on which his papers were kept was outside the control room door. The inference to be drawn from his testimony is that from the knowledge he had of the work being done, he would not expect any electrician to have occasion to use the enunciator switch controlling the alarm panel.

Vestal testified that the alarm panel was on all the time unless an electrician turned it off when required by his work, and that he would turn it on again when he was finished. He explained his previous deposition testimony that Shell had energized the circuit by saying that the circuit was usually energized when he got to work and that the Shell training class arrived before

he did every morning. He testified that he knew the alarm circuit on which Lamb was working was energized; that he was relocating the alarm device; and that it was not new construction. Lannon, the working partner of Lamb, disputed this testimony, and said that it was new construction which should not have been terminated, and that he did not know the wire was energized. Vestal was tendered as a witness by Fisk. His testimony was not consistent in material respects with that of Lannon and Brantley, witnesses tendered by the Lambs. He testified that a careful electrician would not work on a hot wire; that he could shut off the electricity by throwing a switch, disconnecting the wire, or by shorting out the circuit; or that he could tape the exposed part of the wire.

None of the areas in the C/A Unit were in use for production purposes. The alarm system was in use in connection with the training work being conducted in the brine treating area. Mr. Colditz, the assistant manager of operations for Shell, testified that the switches in the control room did not remain on all of the time, and that the trainees were taught how to turn on and off the various switches, and that the switches were turned on and off in the training sessions. He did not know whether the flow of electricity to the area where Lamb was hurt was on or off on the morning of June 7, 1966. He did not remember whether he had visited the control room that morning, but he was at the main office when the accident happened.

In attempting to determine who turned on the switch activating the electric line involved in the accident resulting in the death of Mr. Lamb, no one can be eliminated as possibilities other than the witnesses who testified. However, it cannot be considered probable that anyone would have used the switch other than the electricians and the Shell trainees. The jury might have concluded from the testimony that the switch was turned on by the Shell trainees who were shown to have been present during the period of time in ques-

tion and who did from time to time operate the switches. They might, however, have refused to accept the testimony of Mr. Brantley that the switch was off when he came to work, and then determined that the switch was turned on before 8:15 A.M. The jury might simply have determined that there was not sufficient evidence to convince them that Shell employees rather than the electricians turned on the switch that morning. Mr. Vestal did not testify directly that none of the electricians had a reason for turning on the switch.

■ It is the province of the jury to determine whether a disputed fact in issue has been sufficiently established by circumstantial evidence. Gulf, C. & S. F. Ry. Co. v. Battle, 169 S.W. 1048 (Tex.Civ.App.—Austin 1914, writ ref.). This determination is subject to the jurisdiction of this court to reverse in the event it is found to be contrary to the great weight and preponderance of the evidence. Texas Employers' Ins. Ass'n v. Bauer, 128 S.W.2d 840 (Tex.Civ.App.—Amarillo 1939, error dism'd, judgment corr.). If reasonable minds may not differ as to the inferences to be drawn from the circumstantial evidence, the ultimate fact is established as a matter of law. Prudential Insurance Company of America v. Krayer, 366 S.W.2d 779 (Tex.1963). If there is no direct evidence as to the existence of an ultimate fact and the proven circumstances are consistent with either of two theories and there is nothing to show that one rather than the other probably is correct, then neither is proven. Dyess v. Connecticut General Life Insurance Co., 454 S.W.2d 860 (Tex.Civ. App.—Dallas 1970, rev'd Tex., 463 S.W.2d 724, on remand Tex.Civ.App., 466 S.W.2d 841).

Thus the question presented for decision is narrow. The jury might reasonably have determined from the circumstances in evidence that a Shell employee turned on the switch activating the alarm system after 8:15 A.M. on the day in question. From the evidence that the alarm system was used in connection with the training classes, that it usually was left on, and that trainees were present in the room during the critical period the jury reasonably could have concluded that if a trainee discovered the alarm system turned off, he probably would have turned it on. There is no evidence that the trainees had. actual knowledge of the fact that a dangerous situation would be created thereby. In other words, the jury might have decided that it was more probable that a trainee turned on the switch than it was that an electrician did since no electricians were shown to have been present or to have had a reason for turning off the switch. However, the jury could have rejected Brantley's testimony that the alarm panel was off when he came to work. His testimony was contradicted in other respects material to the case and by circumstances in evidence. A question of credibility was presented.

■ Appellate courts are not authorized to set aside verdicts of the jury merely because the verdict seems to be against the preponderance of the evidence. The verdict must be against the preponderance of the evidence to the degree which shows that manifest injustice has been done, that is, it must be affirmatively wrong. Nations v. Miller, 212 S.W. 742 (Tex.Civ. App.—El Paso 1919, error den.).

■ The answer made by the jury is not so contrary to the preponderance of the evidence as to be affirmatively wrong.

Appellants complain of action of the trial court in allowing Fisk six peremptory challenges. They do not complain of his action in allowing both Shell and Ferguson six challenges. Fisk was brought into the suit by Ferguson who alleged that under the terms of a subcontract between Ferguson and Fisk, which subcontract Fisk was performing at the time of the accident, Fisk agreed "to pay and indemnify it from and against all loss, expense, damages, claims, suits or subrogations, resulting from injury, including death, sustained by any employee of Fisk Electric Company arising from any cause or for any reason."

Appellants seek no relief against Fisk.[1] While Fisk plead a general denial, it did not in its pleadings pinpoint any factual dispute existing between it and Ferguson. The attorneys for Fisk and Ferguson entered into a stipulation during the trial that an indemnity agreement substantially in the language of the pleading was contained in the subcontract except that it included the language that the injury must be one "arising out of the work performed under the contract." The contract itself was not produced at the trial.

■ Fisk contends that there was an issue of fact as to whether the work being performed by Lamb was "performed under the contract." Without inspecting the contract the trial court could not determine whether such an issue would arise at the trial, nor can this court. No other issue of disputed fact as between Ferguson and Fisk is suggested. The trial court erred in allowing Fisk six peremptory challenges. There is no showing that Fisk and Ferguson were antagonistic as to a matter with which the jury was to be concerned. Retail Credit Company v. Hyman, 316 S.W.2d 769 (Tex.Civ.App.—Houston 1958, writ ref.).

Appellants do not argue in their brief that they were forced to take an objectionable juror by reason of the court's action, although in their motion for new trial they alleged that they were required to try the case with six jurors "less desirable to plaintiffs' cause of action than the six jurors struck by Fisk Electric Company." They argue that they were denied a fair trial by reason of the matter.

An examination of the jury lists included in the record shows that Fisk struck four prospective jurors who otherwise would have served on the jury panel trying the case: Joyce M. Cannon, a secretary for an insurance agent; Mrs. Phil M. Rowe, a housewife, whose husband is in charge of maintenance work for American General Insurance Company, and who had previously served on a jury in a personal injury suit; Kairinthia Sanchez, employed as domestic help; and Mrs. Jerry Maresh, a widow, whose husband was a tailor. The last four people chosen to serve on the jury, listed in order, were: Raymond F. Delay, an electronics technician employed by Philco-Ford; C. E. Ladner, a chemical engineer for Hughes Tool Company, whose education included the study of electrical engineering, and who regularly called on Shell in a sales capacity; Albin S. Cegielski, a steelworker, who held the position of assistant foreman with Graver Tank, a company that contracted with Fisk from time to time and also sold tanks to Shell; and Mrs. Sarah J. Tomlin, a secretary employed by "Motorola C Y E Ins."

Appellants objected to the court's action in permitting Fisk six jury strikes before the examination of the jury panel. After the strikes were made, but before the composition of the jury was determined, appellants again urged the court to disregard the strikes made by Fisk stating to the Court that Fisk's interests were not "antagonistic in whole or in part to any of the other parties in the main cause asserted by plaintiffs" and that the liability of Fisk would be determined as a matter of law from the contract between Fisk and Ferguson. In addition to the matters shown by the Statement of Facts, appellants took a formal Bill of Exception to the trial court's action in allowing the strikes.

On October 14, 1970, some months prior to trial, appellants filed a motion for severance praying that the cause of action asserted by Ferguson against Fisk be severed from the main action. In this motion they asserted that Fish would request six separate peremptory strikes, as they had at a previous setting, which would result in the defendants having a total of eighteen strikes as contrasted with six for the plaintiffs. The motion was denied and no complaint is made of this action on this appeal. It is noted here to illustrate the concern

1. See Turner v. Turner, 385 S.W.2d 230 (Tex.1965).

plaintiffs felt as to the effect of the disproportionate number of strikes on the trial of their suit, and the vigilance exercised by appellants in their efforts to protect their rights.

There is authority for the statement that the failure to allow the proper number of peremptory challenges will not be reversible error in the absence of a showing that a juror objectionable to the complaining party sat on the case. Gussett v. Nueces County, 235 S.W. 857 (Tex.Com.App.1921, judg. adopted); M. L. Mayfield Petroleum Corporation v. Kelly, 450 S.W.2d 104 (Tex.Civ.App.—Tyler 1970, error ref'd, n. r. e.); Texas Employers Insurance Ass'n v. Shropshire, 343 S.W.2d 772 (Tex.Civ. App.—Texarkana 1961, error ref'd, n. r. e.).

Professor McDonald says that it is impossible to show harm where a party is denied peremptory challenges to which he is entitled, and that a showing of harm in such a case is not required. 3 McDonald, Texas Civil Practice (1970 revised), § 11.12.3.

In Tamburello v. Welch, 392 S.W.2d 114 (Tex.1965), the Supreme Court said:

"If defendants must establish that the error in denying them additional challenges probably caused the rendition of an improper judgment, the matter of peremptory challenges will rest almost entirely in the uncontrolled discretion of the trial judge. It is not realistic, moreover, to let affirmance or reversal turn on the attorney's reasons for wanting to strike a particular member of the panel. The right to eliminate a prospective juror for any reason that seems adequate to counsel is the very essence of the peremptory challenge. Members of the panel who are not prejudiced in a legal sense may be and frequently are challenged because of their background, associations, appearance or demeanor. The decision to strike is, in the last analysis, a matter of personal judgment

usually based in large measure upon intangibles not susceptible of precise description and which cannot be fairly appraised by a trial or appellate court. A litigant who is denied the right to challenge on that basis is deprived of a valuable means, guaranteed him by law, of insuring that the controversy is decided by a jury whose members are not predisposed by reason of temperament or prior experience to look with disfavor upon his side of the case.

"In Texas Employers' Ins. Ass'n v. McCaslin, 159 Tex. 273, 317 S.W.2d 916, we observed that an action or occurrence may be so highly prejudiced and inimical to the fairness of a trial that the burden of going forward with proof is met, prima facie at least, by simply showing the improper act and nothing more. It was also pointed out that the burden of the complaining party is met by showing that the trial which resulted in a judgment against him was materially unfair

. . .

". . . .

"We think this is the proper approach to the question of harm in the present case. If a party is improperly denied a single challenge to which he is entitled, the trial may not be so unfair as to warrant a reversal in the absence of some additional showing of prejudice. On the other hand a judgment could not be permitted to stand where one of the litigants has been allowed no peremptory challenges at all."

■ In this case the appellants have met their burden of showing that the trial which resulted in a judgment against them was materially unfair.[2] The judgment that appellants take nothing against Shell Chemical Company and Shell Oil Company is reversed and remanded for a new trial.

The trial court instructed the jury to render a verdict that appellants take noth-

2. See article by Albert P. Jones, "Preemptory Challenges—Should Rule 233 Be Changed?", 45 Tex.Law Review, pp. 80 et seq.

ing against H. K. Ferguson Company. Appellee Ferguson contends that the trial court was correct in this ruling because (1) the evidence conclusively shows that Ferguson did not have control of the alarm panel of the C/A Unit, which was the area from which the allegedly dangerous condition emanated; (2) the evidence conclusively shows that Lamb's supervisor, J. O. Vestal, was aware that the alarm system was frequently activated and energized by Shell personnel during working hours and, consequently, Ferguson owed no duty to warn Lamb of such condition; and (3) the evidence conclusively shows that the alleged dangerous condition was transitory and inherent to the work being performed by Lamb's employer and Ferguson owed no duty to warn Lamb or otherwise insure his safety.

■ Since the trial court directed a verdict, this court must consider only that evidence, and reasonable inference to be drawn therefrom, favorable to appellants, and those facts established by uncontroverted evidence. In this connection it must be noted that Fisk Electric Company's interests are directly antagonistic to the position of appellants. The testimony of James Vestal, the Fisk foreman supervising the work in which Lamb was engaged at the time of the accident, must be tested by the rules applicable to an interested witness. The position of Fisk and Ferguson in relation to appellants is identical. Vestal's employer is interested in the outcome of appellants' suit against Ferguson. The weight to be given his testimony is a matter for the determination of a jury. Weidel v. Hofmann, 269 S.W.2d 945 (Tex.Civ. App.—Austin 1954); 4 Tex.Jur.2d, Appeal and Error—Civil, § 831.

The duty of a general contractor to the employees of a subcontractor is summarized in Pence Construction Corporation v. Watson, 470 S,W.2d 637 (Tex.1971). There the court said:

"The duty of Pence, as general contractor, to Watson, as an employee of a subcontractor, is that duty of the owner or occupant of land owed to a person invited to use the premises for business purposes. Smith v. Henger, 148 Tex. 456, 226 S.W.2d 425 (1950). The duty is discharged by a warning to the invitee of unreasonable risks of harm either known to the general contractor or which would be known to him by reasonable inspection. Western Auto Supply Co. v. Campbell, 373 S.W.2d 735 (Tex. Sup.1964). No warning need be given by the general contractor as to those dangers which the contractor knows to be within the knowledge of the invitee. McKee, General Contractor, Inc. v. Patterson, 153 Tex. 517, 271 S.W.2d 391 (1954); Lowe Chemical Co. v. Greenwood, 433 S.W.2d 695 (Tex.Sup.1968). " . . . .

"Since the subcontractor holds a duty to his employees to warn them of dangers where they are working, the general contractor should not ordinarily be required to anticipate his failure to do so. " . . . .

"The general contractor is ordinarily not required to tell one crew or employee of a subcontractor what another crew or employee of that same subcontractor has done in the performance of the work for which the subcontractor is employed. See Hailey v. Missouri K. & T. RR., 70 S.W.2d 249 (Tex.Civ.App.1934, writ ref.); Humphreys v. Texas Power & Light Co., 427 S.W.2d 324 (Tex.Civ. App.1968, writ ref., n. r. e.); Moore v. Texas Company, 299 S.W.2d 401 (Tex. Civ.App.1956, writ ref., n. r. e.). It may be that under some circumstances there would be a concealed danger or special problem which, though created by a subcontractor's employee, the general contractor should take extra measures to call to the attention of other employees of that subcontractor. If there be such a case, the danger would have to be one that the employee would not recognize by examination of his worksite. . . . ."

The instrumentality which created the dangerous condition was a live wire. Lannon testified that he and Lamb installed this wire to the general area where it was to be connected to an instrument. They were not able to complete the piping because the location for the instrument had not been determined. They stopped this installation several days or a month before the accident. On the day of the accident he and Lamb were to complete the piping to the instrument. They were not moving the alarm conduit from one place to another. They were adding conduit, not tearing it out. As a matter of work jurisdiction the wire would have been pulled through the conduit and connected to the alarm panel by an electrician. There was no reason for the wire to have been connected to the alarm panel. He did not know that it was so connected.

Lannon and Lamb had been working together on this job five days a week for several months. Both had been in and out of the control room during this time. Lannon had never seen the panel alarm board when it was turned on. There was no way the alarm board could be energized without lights showing at that time. He did not know the wire was hot because the job wasn't finished.

On the morning of the accident Lannon and Lamb had formed a piece of conduit and Lannon was standing by the ladder with it in his hand preparing to climb up and screw it into the conduit already in place. At this time he was called away by the general foreman. Part of the wire had already been pulled through the installed conduit before the job was abandoned. A coil of this wire was hung up on the conduit. The insulation had been removed from the end of the wire. He did not see anyone test the coil of wire. He was gone about ten minutes and when he returned Lamb was lying on the floor.

A carpenter testified that as he was entering the area he heard a noise, saw a flash, and saw Lamb falling from the ladder.

Lannon had seen the Shell operators all over the control room. He did not know what they were doing. He saw them looking at prints and looking at dials. He did not know by virtue of what he had been told that the alarm panel had been on. He knew that if the alarm panel was "lit up" it would be hot throughout its entire circuitry. In order for the coiled up wire to have shocked Lamb, it must have been energized, and must have been connected to the alarm panel.

In new construction the last thing the electrician does, except for testing, is to energize the wire. Until he reaches the "hook-up stage" the electrician working on new construction considers wires just like rope or cable. He doesn't worry about whether they are hot. A 110 volt wire would not be expected to give a severe shock to a man standing on a wooden ladder unless he was grounded in some manner. They were going to have to work in very close quarters that morning. The piece of conduit was to be installed up through a grate. They had to get "in, up and around" some valves, pressure piping, and angle iron brackets. It would be necessary to "sort of shape yourself around the existing structure to do it." Anything that would return the electricity to its source, such as metal pipe, would act as a grounding agency.

Brantley testified that the alarm panel lights were not on when he got to work and that he looked at the panel when he started to leave after he learned that someone had been hurt and the alarm panel was on. He did not turn it on. He had seen the alarm panel on before that morning. He went to the area where Lamb was injured. He saw the coil of wire, and checked it with his voltage tester. It was hot. He taped the bare end of the wire. He saw a piece of conduit partially installed above the area where Lamb lay. The coil of wire was less than two feet from the conduit with which Lamb was working. He would not have suspected that the wire was hot had he not known of

the accident. He did not know that this particular circuit was connected.

In the years he had worked in Harris County he had never known of an instance where the owners turned on the electricity to an area where electricians were working on new construction. The electrical contractor, according to the customary practice in the industry, controlled the electric current going into new construction.

Brantley examined the wire and concluded that Lamb could not have been rerouting the wire. The coiled wire was long enough to reach the destination. The bare wire had turned dark. If Lamb had just pulled it out it would have been "fresh". The wire had been exposed for a good many days. From this point the place where the wire was hooked up could not be seen.

Brantley testified that the alarm panel could easily be seen in the control room and that if it was lit up, he would know that the wires running into the "alarms" were hot. He knew that Shell had accepted certain areas of the C/A Unit for operation and that they were operating the alarm systems in those areas. He also knew that in phase construction the owners turned on electric current running into areas accepted by them. He knew that the alarm board had been hot off and on for about three weeks before the accident. Most of his working time on the job was in the control room.

James Vestal was called as a witness by Fisk. On the date of the trial he was employed by Fisk as an electrical supervisor. He testified that on the morning of the accident he assigned Lamb and Lannon to the job of relocating some thermo-coupling and controls for an alarm circuit that had been run to the wrong location. So far as he knew it was installed in accordance with the plans and specifications. It was a "revision" or "change-out" job. Ordinarily in new construction the conduit is installed first, then the wire is pulled through the conduit, and finally both ends are terminat-

ed. After he assigned them to the job, he left the area. When he learned of the accident he returned. Some minutes later he and Shell representatives checked the area. He saw the hand-coiled piece of wire. It was taped to the conduit. He didn't see any bare wire, but he wasn't paying attention to such details at that time. No one worked in that area the balance of the day following the accident. The day following the accident he had Brantley test the wire with a volt meter and it was found to be hot. .

Vestal's testimony was positive to the effect that the work Lamb and Lannon were doing was a relocation job and that the wire was connected to the sensing device "when they started removing it." He testified that they had brought numerous "alarms" in from all over the area to terminate them into the panel, and that the line Lamb was working on was terminated "originally" into the control panel, and that it was still terminated into the control panel when the work began. He testified that had he been doing the job before he began pulling the wire through the conduit to be removed, he would have shorted out the switch by touching the bare end of the wire to a pipe. This would have turned the circuit off. He would then have clipped off the curled end, which would have been attached to the sensing device, so that it would not catch when it was pulled through the pipe. Since the wire was in service, an experienced electrician would have checked to see if it was hot before he started working with it. If the bare wire was pulled through the conduit and touched it, the circuit would have shorted out.

Vestal testified that on the morning of the accident he knew that the alarm panel had been energized, and that every "hot lead" wire that was hooked up was energized, but that whether the return was energized would depend on the condition in the field. Fisk employees would hook up the wires. Shell had taken over the panel on the basis that if anything was found to

be faulty or wired wrong, it was the responsibility of Fisk to correct it. "Or if we had something that was a late arrival, that would involve stages. If one stage wasn't completed, we would have to go back in and work this."

He said that the part of the control panel Shell had "bought," including the alarm panel, was on constantly unless someone came in with a new circuit to terminate and shut it off, or unless someone was working and turned it off. There was some work "involved with this," so that it was probably off and on during this period. He testified that if the alarm panel was energized there would almost certainly be some lights showing. If there were faults, there would be flashing lights; if there were some alarms that were not connected, there would be continuous lights, but if there were no faults, the panel could be energized and have no lights lit up at all.

Mr. Colditz testified that the C/A Unit was composed of four basic sections and a fifth section which was an adjunct to one of the basic sections. Since there were several distinct areas to perform their own function, it was advantageous to the contractor and to Shell to have the construction of each of these individual areas completed in a certain sequence. This enabled Shell to assume the responsibility and control of one area at a time, and make it ready for the ultimate operation. The brine treating area was turned over to Shell on May 13, 1966, and the reagent preparation area on May 20, 1966. The other areas had not been turned over to Shell on June 7, 1966. The control room was turned over to Shell in May of 1966. Certain areas of the control panel dealt with distinct areas of the unit. When an area was turned over to Shell, the corresponding area on the control panel was also turned over. One switch activated the alarm panel, which was common to all areas. The alarm panel was initially activated when the first unit was turned over to Shell. From May 13, 1966 to July 7, 1966, the alarm panel was generally activated. "The only reason it would be turned off is if there were additional hook-ups to make on the alarm panel or there was something to be fixed in connection with it." It probably would be turned off by Shell personnel at the request of the contractor. The training of the Shell personnel could have been conducted without the alarm panel, but it was advantageous to have it activated. It was not necessary to the operation of the alarm system in the areas turned over to Shell that the wires he energized which ran into other areas. If these wires were not connected to the sensing instrument in the area, and the two wires in the line were not touching, the light to which they were attached would not be lighted. There was no reason for those wires to be activated.

Mr. Colditz did not know prior to June 7, 1966, that the wire from the alarm system into the chlorine handling unit had been hooked up. Neither Fisk nor Ferguson told him not to use the alarm system in his training class. Had they done so, he would have deactivated the system by turning it off and tagging it or by unhooking it. The Ferguson Company authorized Shell to use the alarm panel. The final leads and connections to the terminal board could be hooked up in a matter of hours so that the incomplete units could be connected just before these areas would be put into operation.

■ The evidence discloses a condition existing on premises under the control of Ferguson which created an unreasonable risk of harm to persons invited to use the premises for business purposes. The unfinished alarm installation terminating in a coil of wire, the end of which was bare, in the brine treating area which was under the control of Ferguson, was an unreasonably dangerous condition. The wire was energized most, but not all, of the time. It was new construction and experienced electricians would not expect it to be hot because new construction is not customarily terminated until it is completed. The

danger was greater because the wire was not energized at all times and a test might be made without revealing the danger. There is no testimony that the dangerous condition was known to Lamb, or that he had been warned of the danger. The danger was not open and obvious. A jury question is presented as to whether the unreasonable risk of harm would have been known to Ferguson had a reasonable inspection been made. There is no evidence that Ferguson had actual knowledge of the condition or had warned Fisk, Lamb's employer, of this condition.

"The general contractor is ordinarily not required to tell one crew or employee of a subcontractor what another crew or employee of that same subcontractor has done in the performance of the work for which the subcontractor is employed." Pence Construction Corporation v. Watson, supra. In Pence the court recognized that under some circumstances in a case of a concealed danger or special problem created by a subcontractor's employee, there might be a duty on the general contractor to warn other employees of that subcontractor of the danger.

In this case the evidence would support the conclusion that Lannon and Lamb installed the line to the general area of the sensing instrument, coiled the wire and temporarily abandoned that job without terminating either end of the wire. Thereafter another Fisk employee terminated one end of the wire into the alarm panel in the belief that it had been terminated into the instrument at the other end. It was the usual practice to install the sensing instrument first, and then the conduit. The wire would then be pulled and terminated. It was not necessary to terminate the wire into the alarm panel at that time if the panel was in operation, and to terminate it would necessitate shutting down the alarm system temporarily.

It might be reasoned that another employee desiring to terminate another line into the alarm panel terminated the line in

question at the same time assuming it to have been completed according to the usual custom. The evidence does not establish that any Fisk employee knew that the line was energized *and* was not terminated properly. While Vestal testified that he knew the line was energized, he did not know that it was terminated only at the alarm panel.

There is no evidence that Vestal worked on the line personally or that he inspected the work. There is evidence that if the line was properly terminated at both ends, the light on the alarm board would not burn. There is also evidence that if the line was not terminated into the instrument and if the two ends of wires in the line were not in contact, the light would not burn. Accepting this testimony, Vestal could not know from an inspection of the alarm panel whether or not the line in question was energized. His testimony that he knew the line was energized must be considered in context with his testimony that the line had been terminated in the instrument and was being removed and relocated at the time of the accident. This testimony was contradicted by Lannon.

The evidence is not conclusive that any supervisory employee of Fisk had knowledge of the dangerous condition existing in the area where Lamb was injured, or that any one Fisk employee had such knowledge. The danger was transitory, but it was not inherent to the work being performed by the subcontractor. The danger was concealed and not one that would be recognized by the employee by an examination of his work site.

 Viewing the evidence in the light most favorable to appellants there was a concealed danger involving an unreasonable risk of harm to the injured employee which was not known to him, his employer or the general contractor. The general contractor had the duty to make a reasonable inspection of the premises for such concealed dangers. Whether or not a reasonable inspection would have disclosed

the danger is a jury issue. Robert E. McKee, General Contractor, v. Patterson, 153 Tex. 517, 271 S.W.2d 391 (1954).

The trial court erred in instructing the jury to return a verdict for appellee, H. K. Ferguson Company.

Reversed and remanded.