Mary Ruth DYESS, Petitioner,

v.

CONNECTICUT GENERAL LIFE INSUR-
ANCE COMPANY, Respondent.

No. B–2234.

Supreme Court of Texas.

Feb. 17, 1971.

Rosenfield, Berwald, Mittenthal & Kopp-
man, Freeman L. Mittenthal and Edward
S. Koppman, Dallas, for petitioner.

Bowyer, Thomas & Sweet, William
Sweet, Jr., Dallas, for respondent.

McGEE, Justice.

Mary Ruth Dyess, the beneficiary under
a Group Accidental Death policy, filed this
suit against the Insurance Company to re-
cover accidental death benefits for the
death of her husband. The trial court
overruled plaintiff's motion for judgment
based upon a jury verdict, sustained de-
fendant's motion for judgment *non ob-
stante veredicto* and rendered judgment
that plaintiff take nothing. Judgment of
the trial court was affirmed by the Court
of Civil Appeals. 454 S.W.2d 860. The
judgments of the courts below are reversed
and the cause is remanded to the Court of
Civil Appeals.

Plaintiff alleged that her husband, J. F.
Dyess, on October 10, 1967, sustained bodi-
ly injuries, caused solely by accident in the
nature of gunshot wounds in the chest;
that on the same day, as a direct result of
such bodily injuries, directly and independ-
ently of all other causes, J. F. Dyess died.
Plaintiff sought judgment for the sum of
$20,000.00, together with interest, penalty
and attorney's fees. Defendant filed a
general denial and special plea that Dyess's
death was the result of an intentionally

self-inflicted injury by gunshot. One of the risks excepted by the terms of the policy was: "suicide or intentionally self inflicted injury, while sane or insane."

The jury found: (1) that Dyess's death resulted directly and independently of all other causes from accidental bodily injury; (2) that such death did not result directly or indirectly from suicide; (3) that such death did not result directly or indirectly from an intentionally self-inflicted injury. It was stipulated that a reasonable attorney's fee for plaintiff would be $5,500.00.

In view of the action of the trial court in granting a judgment *non obstante veredicto*, on the ground that there was no evidence to support each finding of the jury, we must review and consider *only* the evidence and the reasonable inferences therefrom which support the answers of the jury, and reject the evidence and inferences which are contrary to the jury's findings. Butler v. Hanson, 455 S.W.2d 942 (Tex.Sup.1970); C. & R. Transport, Inc. v. Campbell, 406 S.W.2d 191 (Tex. Sup.1966); Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609 (1950); Cartwright v. Canode, 106 Tex. 502, 171 S.W. 696 (1914); Calvert, No Evidence and Insufficient Evidence Points of Error, 38 Texas L.Rev. 361 (1960).

We will summarize the evidence most favorable to plaintiff and in support of the jury findings. Mr. and Mrs. Dyess were getting along fine before and at the time of his death. At the time of his death, he was experiencing no financial difficulties. Dyess had been regularly employed by the same employer for about ten years. His fellow employees observed that he appeared to be happy in his work, enjoyed a good relationship with his fellow workers, and exhibited a happy disposition.

Dyess had a keen interest in sports and had made plans to go hunting on his farm on Wednesday, October 11, 1967, before going to Lubbock to attend the Texas Tech-Texas A & M football game the following Saturday. Tickets for the game had been purchased by his son, Michael. Dyess and Mrs. Dyess planned to spend the day with him Saturday and Sunday. Dyess frequently went hunting, fishing and engaged in other activities with his children.

Dr. Campbell, Dyess's family doctor, testified that Dyess, prior to February, 1966, had shown symptoms of depression and crying. Dr. Markowitz, Dr. Campbell's partner, at that time prescribed Etrafon for emotional problems. Dr. Campbell referred him to Dr. Timkin, a psychiatrist, who did not continue to see him. Dr. Campbell "saw him about three times or so after that, on this one drug, and he apparently improved." Dr. Campbell and Dr. Markowitz continued to see him until June of 1966. Dr. Campbell had no notes, nor could he recall Dyess saying anything about suicide. Dr. Markowitz, on February 2, 1967, referred him to Beverly Hills Hospital. Dyess was not seen in Dr. Campbell's office between June, 1966 and February, 1967.

Dyess was under the direct supervision of Dr. Speegle during his stay in the Beverly Hills Clinic from February 2, 1967 to April 6, 1967. Dr. Speegle, reading from the hospital records related part of the information in Dyess's file: "Chief complaint: Depression, preoccupation with religion, delusional and hallucinatory." He diagnosed Dyess as a schizophrenic paranoid.. Dyess stated that he had thought about committing suicide. For this reason Dyess was closely observed for four or five days. He was given tranquilizers and a combined program of electric shock and insulin coma therapy. He soon appeared to get over what appeared to be the hallucinatory activity. He became in better spirits. He no longer was depressed and he was increasingly pleasant and more cooperative. Dr. Speegle's opinion at the time of Dyess's discharge from the hospital was that he was " * * * in complete remission of symptoms and was over his schizophrenic reaction." He was, according to Dr. Speegle, "well".

When asked if he recognized the possibility of return of the symptoms, Dr. Speegle replied: "One can have a similar illness more than once. We do not necessarily expect a return nor is return inevitable, whether it is schizophrenic reaction, pneumonia, or various other things, one can have the illness more than once." Dr. Speegle also observed that one who has suffered the symptoms of a schizophrenic paranoid type is no more likely to have them again than one who has not suffered from them. Dyess came back for two follow-up treatments but missed the third because of his physical illness. Dr. Speegle further testified that he was not aware of any general feelings on the part of psychiatrists that paranoid schizophrenics are particularly prone to self destruction. Dr. Speegle observed that on the return visits, Dyess was in excellent spirits, showing no signs of the symptoms similar to those at the time of his admission to the hospital. Dyess showed no signs of being depressed or entertaining suicidal thoughts. Further, Dr. Speegle testified that he did not feel a person could be very depressed, certainly to the point of suicide, without it being very obvious to those around him. With reference to Dyess's suicidal tendencies while in the hospital, Dr. Speegle testified: "I would think that they were more towards the fleeting end of the spectrum * * * rather than really suicidal plans * * *. Of course, with a few shock treatments they cleared up in just a matter of a few days * * *. I would feel more likely that while we instituted suicidal precautions, I was not truly concerned that the man really was, would try to do something to harm himself at that time."

On October 9, 1967, Mrs. Dyess called her husband to come home from work to take her, her sister's child and a neighbor's little girl to the State Fair of Texas, along with their own two children, and to accompany her to see Dr. Campbell, with whom she had an appointment. Her sister said she saw Mr. Dyess that night after the group had returned from the Fair. Dr. Campbell corroborated Mrs. Dyess's testimony that it was she, not her husband, who had made the appointment. While she was in his office for her appointment he made an examination of Mr. Dyess.

Dyess complained of fatigue, weight loss, loss of appetite and nervousness. Dr. Campbell asked Dyess whether he had suicidal ideas, and he said that he did not. Dr. Campbell gave him two prescriptions, Mellaril and Elavil, as tranquilizers to relax tension and relieve anxiety. Dr. Campbell detected no symptoms indicating that Dyess was emotionally disturbed. Dr. Campbell was of the opinion that Dyess was suffering from being tired due to working long hours. Dr. Campbell testified "I ascribed everything to fatigue, when I saw him." His employer's record reflected the fact that Dyess had worked overtime.

His employer's bookkeeper testified that Mr. Dyess was granted permission on October 10th to take a week's vacation; that in fact, he was entitled to three weeks vacation. Having decided to take a week of his vacation, Dyess was home on the morning of October 10, 1967 at the time his wife left to go to work. She said his health appeared to be fine. Mrs. Dyess telephoned the house about 3:00 p. m. and talked to her husband, requesting him to start the evening meal because friends were coming over that night for supper and to play dominoes. Mrs. Dyess testified that when she got home she found beans cooking in a stewer and potatoes boiling in another stewer.

After the phone call, Dyess was seen by one of his sons, Jeffrey, who had returned from school about 3:30 p. m. He observed his father vacuuming the floor of the livingroom and was greeted in the usual manner. Jeffrey added water to the stewing beans before leaving for football practice. When Jeffrey left about 4:30 his father was sitting in a reclining chair in the livingroom reading a newspaper, and had removed his shoes. His father offered to

drive him to football practice, but he decided to ride his bike.

Mrs. Dyess returned to her home about 5:15 p. m. that afternoon and found her husband lying on his back on the floor of the den. His 12-gauge shotgun was lying across his left arm. It was established that the time of death was between 4:15 p. m. and 5:15 p. m. and that the cause of death was a gunshot wound inflicted by the 12-gauge semi-automatic shotgun. When the body was discovered there was one empty shell from the gun lying on the floor near the gun and there were no other shells in the gun. No suicide note was found. Mrs. Dyess found the gun cleaning kit under the sink; normally it was kept in the bathroom closet near the front bedroom. On the day of Dyess's death, his son, Joel, had seen the gun cleaning kit on the dryer in the kitchen.

About two weeks before his death, Dyess and two of his sons, Michael and Joel, had been hunting at their farm in Pittsburg, Texas. In the afternoon Dyess had let Michael use the 12-gauge shotgun. He said he fired the gun four separate times. After firing the gun four times, a shell jammed in the gun. He repeatedly pulled the trigger, trying to get the gun to fire, but it would not go off. He tried to pry the shell out with a pocket knife, but was unsuccessful. He then removed the other two shells from the magazine, leaving the jammed shell in the gun barrel. Michael then closed the bolt of the gun and put it on "safety". He then put the gun in its case and placed it in the back of the truck. He did not mention this problem to his father. Upon returning home, the shotgun was placed in the closet in the livingroom. About two days later Joel told his father about Michael's experience with the jammed shell and his inability to remove it. Joel never saw his father do anything with the gun up to the date of his father's death, nor did Mrs. Dyess or anyone else. There was testimony that Dyess always cleaned his guns before going hunting.

Otts, a gun expert, testified that he examined the shotgun and that a deformed lead shot, approximately .091 inches in diameter fell out when the trigger was removed; he also testified that the gun had other defects. Miller, another gun expert, who had examined the gun after he learned of the above finding in the Otts report, made an experiment with respect to the lead shot by placing it under the sear, and he found a place where the shot would engage the hammer which would cause it to fire if jarred. Otts agreed that if the lead shot had gotten lodged under the sear it could cause the gun to fire, assuming it was cocked.

Miller further testified that he found a flat, triangular dent at the bottom slope of the stock and the sharp cover of the butt plate, indicating either that the gun had been dealt a sharp blow or had been dropped on its butt. The butt of the gun was practically brand new. The den floor of Dyess's house was made of hard tile. Miller also stated that it was not at all unusual for a paper shell, if it got moist, to swell to such an extent that it would jam. He observed a defective pin which had been semi-professionally repaired, that came through the side of the sear, holding the carrier spring in place. This would have caused feeding problems, and the front part of a shell could have been bumped as it went into the chamber, causing it to bulge. This bulging of the shell could have been caused either mechanically or by moisture. Either would cause the shell to jam in the chamber. Miller also testified that the gun would fire if it were dropped with the shot or pellet located under the sear even though the gun was on safety—because the sear is completely independent of the trigger.

We do not believe that Prudential Insurance Co. of America v. Krayer, 366 S.W. 2d 779 (Tex.Sup.1963) and Combined American Ins. Co. v. Blanton, 163 Tex. 225, 353 S.W.2d 847 (1962), relied upon by respondent and the Court of Civil Appeals, are controlling here. In the *Krayer* case,

the deceased, in addition to many other facts which would lead to the conclusion that he had committed suicide, had left a suicide note. There the deceased had a long history of serious mental illness dating back for several years, in that he had been committed to a mental hospital at the age of fifteen. He had remained in the mental hospital for three years, during which time he was diagnosed as being "unstable and unpredictable" and being of the type who might readily commit acts of violence, including suicide. It was recognized that when he was discharged from the hospital he was still suffering from that mental illness. In the instant case, no suicide note was found. In contrast to the *Krayer* case, Dyess voluntarily hospitalized himself for a condition that was not of the same character as that suffered by Krayer, and after about two months he was discharged and his physician stated that Dyess was "* * * in complete remission of all symptoms and was over his schizophrenic reaction." Dyess was never known thereafter to have exhibited any of the symptoms which caused him to be hospitalized during February. Moreover, Krayer on a prior occasion told his wife that he had intended to commit suicide but "he did not have the guts to end it all." Krayer had purchased a .22 caliber revolver on that occasion, which was returned to the store by his mother and later purchased another .22 caliber revolver (the fatal weapon) before his death.

Likewise, the facts in the *Blanton* case are quite different. Blanton, who had been active in civic affairs, had been employed by a lumber company for nineteen years; his wife had worked there several years. On August 5, 1958, Blanton and his wife were summarily discharged because his employer had discovered that Blanton had taken funds out of the business for himself. Blanton also had received a $9,-000.00 check from a building and loan firm for material used in building his home. His employer confronted him with the fact that the lumber company had not received the proceeds of that check. Payment of the amount of that check was demanded not later than the following Saturday. The court held that these facts and the whole record conclusively established suicide. In the instant case, Dyess was not in financial difficulty, nor was he in danger of having criminal action taken against him. In this case there is evidence that could lead the jury to find that the gun fired accidentally; no such evidence was offered in the Blanton case.

■ We believe that there was evidence to support the submission to the jury of the three special issues. The record is voluminous. There is much evidence to indicate lack of motive or intent to commit suicide. Mrs. Dyess testified that immediately after the shooting the gun-cleaning kit was under the kitchen sink; normally it was stored in the closet in the bathroom near the front bedroom. It is obvious that Dyess had started cooking supper before the shooting occurred. The kitchen was close to the den, where the body was found. The expert testimony indicated that the gun would accidentally discharge by a jar or fall on the hard tile floor, if a person attempted to dislodge a shell from the gun. Dents were found on the new butt of the gun. Moreover, the jury might have reasoned that if Dyess had suicide in mind he would have selected one of the other weapons available in his home (a .22 caliber rifle, a .410-gauge shotgun and a deer rifle) for that purpose; Dyess knew that the 12-gauge shotgun had a jammed shell which his son had been unable to remove. If suicide was his purpose, a jury might reason, why did Dyess select the defective shotgun?

The Court of Civil Appeals, while recognizing that an ultimate fact may be conclusively shown by wholly circumstantial evidence, was in error in holding that there was no evidence to support the answers of the jury to the special issues. The special issues that were submitted properly placed the burden of proof upon the plaintiff. From the evidence related above and the

entire record, facts were proved from which reasonable inferences could be made which support the jury's findings that the death of Dyess resulted from accidental injury and that Dyess did not commit suicide.

 The defendant also had before the Court of Civil Appeals points of error challenging the sufficiency of the evidence to support the jury's verdict. The court did not pass on those points and we have no jurisdiction to consider them. In such a situation the ends of justice are best served by remanding the cause to the Court of Civil Appeals, giving that court an opportunity to reconsider the state of the evidence as exemplified in our opinion, and to exercise the fact-finding jurisdiction conferred upon it by the Texas Constitution, Vernon's Ann.St. Article V, Section 6. Stanfield v. O'Boyle, 462 S.W.2d 270, (Tex.Sup.1971).

The judgment of the Court of Civil Appeals is reversed and the cause is remanded to that court for further consideration.