**STEPHENS COUNTY MUSEUM, INC.,
et al., Appellants,**

v.

**Clara J. SWENSON et al., Appellees.**

**No. 4574.**

Court of Civil Appeals of Texas,
Eastland.

Sept. 21, 1973.

Rehearing Denied Oct. 12, 1973.

McMahon, Smart, Sprain, Wilson, Camp & Lee, Stanley P. Wilson, Abilene, Crawford C. Martin, Atty. Gen., Robert L. Lemmens, Austin, C. J. Eden, Patrick W. Thompson, Breckenridge, J. Edward Johnson, Johnson, Slagle & Bell, Brownwood, for appellants.

Jennings, Montgomery & Dies, Frank Jennings, Graham, Harrell & Thompson, W. G. Thompson, C. J. O'Conner, Breckenridge, for appellees.

WALTER, Justice.

Appellees have correctly stated the nature of this case as follows:

"This suit was filed by the Appellees, Clara J. Swenson and Alma B. Swenson, to set aside cash contributions of approximately $100,000.00 to Stephens County Museum, Inc.; the conveyance of 1761 acres of land to the Appellant Museum; the conveyance of 5777 acres of land and all of their mineral interests to S. T. Swenson, H. C. Logan, President of Citizens National Bank of Breckenridge, Texas, and First State Bank in Abilene, Texas, Trustees; and a certain Declaration of Trust pertaining to said land. After a trial by jury and based upon the verdict of the jury, the trial court entered judgment denying recovery of the first $50,000.00 contributed by Appellees to the Appellate Museum, but setting aside the second contribution of approximately $50,000.00, the conveyances and the Declaration of Trust

awarding Appellees title to the land and mineral rights described in such conveyances and removing the clouds cast on the title thereto by such conveyances, the Declaration of Trust and a Deed of Trust executed by the Appellant Trustees in favor of Farmers & Merchants Bank of DeLeon, Texas. From the judgment of the trial court, the Defendants, now the Appellants, have appealed. By cross-point, Appellees complain of the action of the trial court denying Appellees' recovery of the first $50,000.00 contributed to Appellant Museum."

The first eight special issues and the jury's answers are as follows:

"Special Issue No. 1–A

Do you find from a preponderance of the evidence that at the time of making the first $50,000.00 contribution to Stephens County Museum, Inc., the plaintiffs, Clara J. Swenson and Alma B. Swenson, were acting under undue influence as that term has been defined?

Answer 'Yes' or 'No.'

Answer: _____ No _____

Special Issue No. 1–B

Do you find from a preponderance of the evidence that at the time of making the first $50,000.00 contribution to Stephens County Museum, Inc., the plaintiffs, Clara J. Swenson and Alma B. Swenson, did not understand the nature and subject matter of the transaction and the consequences of their act in making such contribution?

Answer 'They did not understand,' or 'They did understand.'

Answer: They did understand

Special Issue No. 2–A

Do you find from a preponderance of the evidence that at the time of making the second contribution of approximately $50,000.00 to Stephens County Museum, Inc., the plaintiffs, Clara J. Swenson and Alma B. Swenson, were acting under undue influence as that term has been defined?

Answer 'Yes' or 'No.'

Answer: _____ Yes _____

Special Issue No. 2–B

Do you find from a preponderance of the evidence that at the time of making the second contribution of approximately $50,000.00 to Stephens County Museum, Inc., the plaintiffs, Clara J. Swenson and Alma B. Swenson, did not understand the nature and subject matter of the transaction and the consequences of their act in making such contribution?

Answer 'They did not understand,' or 'They did understand.'

Answer: They did not understand

Special Issue No. 3–A

Do you find from a preponderance of the evidence that at the time of executing the deed dated July 14, 1970, conveying 1761 acres of land to Stephens County Museum, Inc., the plaintiffs, Clara J. Swenson and Alma B. Swenson, were acting under undue influence, as that term has been defined?

Answer 'Yes' or 'No.'

Answer: _____ Yes _____

Special Issue No. 3–B

Do you find from a preponderance of the evidence that at the time of executing the deed dated July 14, 1970, conveying 1761 acres of land to Stephens County Museum, Inc., the plaintiffs, Clara J. Swenson and Alma B. Swenson, did not understand the nature and subject matter of the deed and the consequences of their act in signing such deed?

Answer 'They did not understand,' or 'They did understand.'

Answer: They did not understand

Special Issue No. 4–A

Do you find from a preponderance of the evidence that at the time of executing the deed dated November 5, 1970, conveying approximately 5777 acres of land and all other mineral rights owned by the plaintiffs in Stephens County, Texas, to the defendant Trustees, the plaintiffs, Clara J. Swenson and Alma B. Swenson, were acting under undue influence, as that terms has been defined?

Answer   'Yes' or 'No.'

Answer : _____ Yes _____

Special Issue No. 4–B

Do you find from a preponderance of the evidence that at the time of executing the deed dated November 5, 1970, conveying approximately 5777 acres of land and all other mineral rights owned by the plaintiffs in Stephens County, Texas, to the defendant Trustees, the plaintiffs, Clara J. Swenson and Alma B. Swenson, did not understand the nature and subject matter of the deed and the consequences of their act in signing such deed?

Answer   'They did not understand,' or 'They did understand.'

Answer : They did not understand

Special Issue No. 5–A

Do you find from a preponderance of the evidence that at the time of executing the Declaration of Trust dated November 19, 1970, the plaintiffs, Clara J. Swenson and Alma B. Swenson, were acting under undue influence, as that term has been defined?

Answer   'Yes' or 'No.'

Answer : _____ Yes _____

Special Issue No. 5–B

Do you find from a preponderance of the evidence that at the time of execut-

ing the Declaration of Trust dated November 19, 1970, the plaintiffs, Clara J. Swenson and Alma B. Swenson, did not understand the nature and subject matter of the Declaration of Trust and the consequences of their act in signing such Declaration of Trust?

Answer   'They did not understand,' or 'They did understand.'

Answer : They did not understand

Special Issue No. 6

Do you find from a preponderance of the evidence that the plaintiffs, Clara J. Swenson and Alma B. Swenson, did not place the deed dated July 14, 1970, conveying 1761 acres of land to Shephens County Museum, Inc., in the control of Stephens County Museum, Inc., with the intention that it should become operative as a conveyance of the land therein described?

Answer   'They did not,' or 'They did.'

Answer : They did not

Special Issue No. 7

Do you find from a preponderance of the evidence that the plaintiffs, Clara J. Swenson and Alma B. Swenson, did not place the deed dated November 5, 1970, conveying approximately 5777 acres of land and all other mineral rights owned by the plaintiffs in Stephens County, Texas, to the defendant Trustees, in the control of the defendant Trustees with the intention that it should become operative as a conveyance of the land therein described?

Answer   'They did not,' or 'They did.'

Answer : They did not

Special Issue No. 8

Do you find from a preponderance of the evidence that the plaintiffs, Clara J. Swenson and Alma B. Swenson, did not place the Declaration of Trust dated November 19, 1970, in the control of

the defendant Trustees with the intention that it should become operative as a trust agreement?

Answer 'They did not,' or 'They did.'

Answer: **They did not** "

■ The appellants contend there is no evidence to support the findings of the jury to all the undue influence issues except the first ones wherein the jury found that the Swensons were not acting under undue influence when they made the first $50,000.00 contribution and that they understood the nature and subject matter of the transaction.

The Swenson family has resided in Stephens County for approximately ninety years. S. T. Swenson has passed on to his reward since the trial. Clara and Alma are the only survivors of the six children of Peter and Christina Swenson. At the time of trial, Clara was 92 and Alma was 84 and their brother, S. T., was 95. The Swenson family was very conservative and lived the good life on the ranch. Clara and Alma had been schoolteachers but were never married and had no children.

Clara J. Swenson testified substantially as follows:

Until a few months ago, my brother, S. T. Swenson, was in charge of my ranchland and money and had been for about 40 years. During this time, it was my custom to sign checks and other papers that he recommended. I made checks payable to the museum totaling $46,625.-00, "because my brother wanted me to." I would not have made the checks to the museum if he had not asked me to do so, and I want to get my money back from the museum. I did not realize that the $46,625.00 took all my cash savings and bonds. On July 14, 1970, my sister and I executed a deed conveying to the museum approximately 1761 acres of our land. I signed this deed "because my brother wanted me to." I would not have signed the deed if S. T. had not instructed me to do so.

I did not understand that by signing the deed we were giving away 1761 acres of our land to the museum and I did not intend to do so and I want it back. I signed the deed to my home and approximately 5777 acres of land on November 5, 1970, "because my brother wanted me to." S. T. told me to sign the deed and I would not have signed it otherwise. I did not understand that by signing the deed we were transferring our home and 5777 acres of our land to the trustees and I did not intend to do so and I want to get my home back from the trustees.

The trust instrument of November 19, 1970, which my sister and I signed that placed our brother and the other trustees in control of our home and the 5777 acres of land, was signed by me "because my brother wanted me to do so". My brother told me to sign the trust instrument. I would not have signed it otherwise. I did not intend to give up control of my home and my land.

Alma B. Swenson testified substantially as follows:

Until a few months ago, my brother, S. T. Swenson, was in charge of my ranchland and money. He was in charge of my land and money for about 30 years. While he was in charge, it was my custom to sign checks and other papers that he recommended. I signed checks totaling $52,125.00 to the museum because my brother wanted me to. I would not have executed the checks to the museum if my brother had not instructed me to do so, and I want my money back. I did not realize that the $52,125.00 took all my cash savings and bonds. Alma testified substantially the same as Clara regarding the deeds and the trust instrument.

It was my custom and my sister's custom and habit to sign whatever documents S. T. approved. We relied on his business judgment in looking after our property. Until our brother went to the hospital, he had a written power of attorney as our

agent. After we learned what had happened during the year 1970, we did not feel that it was safe any longer to have him in charge of our property. After our brother went to the hospital, Clara and I paid his expenses for awhile. We quit paying the expenses because we learned that we did not have the money to pay them. I took this 12 page trust agreement with me and discussed it with my brother and when I started to read it to him he stated:

"Well, I—I read a little of it to him, and he said, 'Well, Alma, I can't understand it, and I don't understand, and I don't understand what you are reading,' and I said, 'Well, all right.' I says, 'You get your lawyers', I says, 'Have you had your lawyers to read it to you? Has your lawyers read it to you?' He said, 'No.' "

My brother and I did not agree on whether our land was included in the trust agreement. My brother contended that it wasn't included and he said that we still owned it. The lawyer, who prepared the deeds and trust agreement, did not read them to me before I signed them. I do not think that my brother would do anything to harm me or my sister financially or otherwise if he knew what he was doing.

S. T. Swenson testified substantially as follows:

He was asked the following questions and gave the following answers:

"Q Please state whether or not, in the summer of 1970, you discussed with either of your sisters any need the museum might have for some lands for use as collateral.

A Yes.

Q If you had such discussions, what was the substance of such discussions?

A Well, we thought that the museum may have to have some collateral.

And what they told me, that they were afraid the internal revenue would ask them for collateral, or may ask them for collateral, somebody may ask them for collateral. And they wouldn't have any. And they wanted this land so they would have their collateral. And my sisters made them a deed to it."

Prior to the time my sisters made cash donations to the museum, I managed their property and business affairs under a power of attorney. I have managed their property and business affairs since about 1900. I do not know how much my sisters had left after they made cash contributions to the museum. I do not know what certificates of deposit or savings bonds they had left after they made such cash contributions to the museum. I don't know whether they had any left or not. I don't know, I couldn't tell you.

Plaintiff's Exhibit 65, is a note dated February 24, 1970, from Alma B. Swenson, signed Alma B. Swenson by S. T. Swenson, payable to the Citizens National Bank. Plaintiff's Exhibit 68, is a note to the First National Bank of Breckenridge in the amount of $1,000.00 dated October 6, 1970, and is signed Alma B. Swenson by S. T. Swenson. Plaintiff's Exhibit 69 is a bank statement from the First National Bank of Breckenridge covering Alma B. Swenson's account and it reflects a deposit of $1,000.-00 from a loan on October 6, 1970. Plaintiff's Exhibit 69, on October 9, 1970, shows an overdraft of $76.94, on October 13 an overdraft of $81.94, on October 15 an overdraft of $126.88, on October 19 an overdraft of $143.79 and on October 20 an overdraft of $164.45.

■ When we consider the appellants' points that there was no evidence to support the findings of the jury, we must consider only the evidence and the inferences which support the findings and reject that which is contrary to the jury's answers. Dyess v. Connecticut General Life Insurance Company, 463 S.W.2d 724 (Tex.Sup. 1971).

Undue influence has been defined by the Supreme Court in Long v. Long et al., 133 Tex. 96, 125 S.W.2d 1034 (1939), as follows:

". . . Generally speaking, undue influence is such influence or dominion as exercised at the time, under the facts and circumstances of the case, which destroys the free agency of the testator, and substitutes in the place thereof the will of another. Undue influence has also been defined as that dominion acquired by one person over the mind of another which prevents the latter from exercising his discretion, and which destroys his free agency. Also, undue influence has been defined as that which compels the testator to do that which is against his will from fear, the desire of peace, or some feeling which he is unable to resist.' 42 Tex.Jur., p. 792, Sec. 2, and authorities there cited."

"It is rarely possible to prove undue influence by what is generally known as direct testimony. Undue influence is usually a subtle thing, and by its very nature it usually involves an extended course of dealings and circumstances. Usually a person charging undue influence must substantiate such charges by circumstances extending over a considerable length of time. It is therefore the settled rule that undue influence can be established by what is known as circumstantial, as well as direct, evidence. Besteiro v. Besteiro, Tex.Com.App., 65 S.W.2d 759; Bergstedt v. Bender, Tex. Com.App., 222 S.W. 547."

The Swenson sisters were well past "three score years and ten" and were heirs to all the infirmities incident to old age. The unnaturalness of the Swenson sisters' act in giving their estate away could be inferred, because during the same year the gifts were made they were overdrawn at the bank, borrowing money at the bank and did not have enough money to pay their brother's hospital expenses. The Swensons had relatives in Minnesota and

California and overseas with whom they stayed in touch by exchanging letters. They were fond of their relatives. Their cousins from Minnesota were present during the trial. They were invited to the trial by the Swenson sisters. After Miss Alma realized that under the trust agreement the trustees had control of their ranchland and were to use the income for their support, she was asked the following questions and she gave the following answers:

"Q . . . Do you want that arrangement?

A No, we do not.

Q Did you ever want an arrangement like that?

A No.

Q Why don't you want that arrangement, Miss Alma?

A Well, because we are able to take care of ourselves.

Q Do you wish to take care of your own property?

A Yes.

Q As long as you can?

A As long as we can.

Q If you reach the point, Miss Alma, that you feel that you need someone to look after your property, do you want the right to choose the persons to do it?

A That's right."

In the case of Rothermel v. Duncan et al., 369 S.W.2d 917 (Tex.Sup.1963), the Court stated:

". . . Thus, before a testament may be set aside on the grounds of undue influence the contestant must prove: (1) the existence and exertion of an influence; (2) the effective operation of such influence so as to subvert or overpower the mind of the testator at the

time of the execution of the testament; and (3) the execution of a testament which the maker thereof would not have executed but for such influence. See: Stewart v. Miller, Tex.Civ.App. (1925), 271 S.W. 311, wr. refused; Olds v. Traylor, Tex.Civ.App. (1944), 180 S.W. 2d 511, wr. refused."

The facts on the issues of undue influence were controverted. We hold that the above facts and circumstances and other facts and circumstances in evidence constitute some evidence of probative force on the issues of undue influence. The appellants' no evidence points relating to undue influence are overruled.

The undue influence issues do not specify the name of the person or persons who exercised undue influence on the Swenson sisters.

The evidence shows all the negotiations leading up to each of the disputed transactions were conducted by the museum with S. T. Miss Alma's testimony was that she was influenced by her brother, S. T. She was asked the following question and she gave the following answer:

"Q And as I understand your testimony, neither Mr. Sandefer, nor Mr. Maxwell, nor Mr. Logan, nor Mr. Eden, influenced you in anyway with respect to anything that you did; it was only S. T. Swenson's influence?

A Well, they were there; they were out there."

The appellants objected to the submission of such issues for the following reasons:

"(a) Because each of such issues inquires as to whether or not with respect to the subject matter set forth therein the plaintiffs were acting under 'undue influence', without inquiring as to the name or identity of the party or parties who may have exerted the same and by virtue of which the jury is permitted to speculate and the jury is allowed to find the existence of influence by persons unknown to and unconnected with any of the defendants in this cause and unconnected with any of the evidence in this cause."

■ Any error in the submission of these issues was harmless because the evidence conclusively shows that the only persons who exercised such influence were S. T. and those connected with the museum. Rule 434, Texas Rules of Civil Procedure.

■ We have considered and weighed all the evidence in this case and find the jury's answers to issues 2–A, 2–B, 3–A, 3–B, 4–A, 4–B, 5–A, 5–B, 6, 7, 8 and 10 through and including issue 53 are not against the great weight and preponderance of the evidence. In re Kings Estate, 150 Tex. 662, 244 S.W.2d 660 (1951).

■ We find no merit in appellants' point contending the court erred in denying six peremptory challenges to each of the appellants.

In Shell Chemical Company v. Lamb reported in Volume 16 of the Texas Supreme Court Journal, May 5, 1973, at page 306, the Court said on page 307 the following:

". . . Rule 233, Texas Rules of Civil Procedure, provides that: 'Each party to a civil suit shall be entitled to six peremptory challenges in a case tried in a district court . . . .' However, the mere fact that one is named as a party to a lawsuit does not in itself entitle him to six peremptory strikes. In order for each of two defendants to be entitled to the six peremptory strikes allowed by Rule 233, it must appear from the pleading that the interests of those defendants are antagonistic on an issue with which the jury may be concerned. See Retail Credit Company, et al. v. S. H. Hyman, 316 S.W.2d 769 (Tex.Civ. App.1958, writ ref'd); William J. O'Day v. Sakowitz Brothers, 462 S.W.2d 119 (Tex.Civ.App.1970, writ ref'd n. r. e.);

M. L. Mayfield Petroleum Corporation v. Kelly, 450 S.W.2d 104 (Tex.Civ.App. 1970, writ ref'd n. r. e.); Brown & Root, Inc. v. Gragg, 444 S.W.2d 656 (Tex.Civ.App.1969, writ ref'd n. r. e.)."

The appellants acted together in motions filed in the trial court and in their objections to the evidence and all of the appellants have signed the same brief in the Court of Civil Appeals. We find the appellants are not antagonistic with each other on the controlling issue submitted to the jury.

■ The appellants contend they are entitled to a new trial on the undue influence issues because of jury misconduct. The undue influence issues which the appellants complain about are special issue 2–a which inquired if the Swenson sisters were unduly influenced at the time they made their second contribution of approximately $50,-000.00 to the museum; special issue 3–a which inquired if the Swenson sisters were unduly influenced at the time they executed the deed dated July 14, 1970; special issue 4–a which inquired if the Swenson sisters were unduly influenced at the time they executed the deed dated November 5, 1970; and special issue 5–a which inquired whether the Swenson sisters were unduly influenced at the time they executed the Declaration of Trust.

Arthur Viertel, foreman of the jury, testified on motion for a new trial substantially as follows:

After I was selected foreman of the jury, I read the Court's charge in its entirety. We then began a study of the special issues. We discussed special issue 1–a for about thirty to forty minutes and were unable to agree on an answer. After we were unable to arrive at an answer to 1–a, it was suggested that we move to 1–b. We did not agree on an answer to 1–b and we then considered special issue 2–a. After discussing 2–a and 2–b, we decided it would be improper to vote on those before we came to some conclusion on the first issue. I believe we voted on 1–a but did not reach a conslusion. We then considered 1–b and reached a unamious decision on 1–b. We answered "that they did understand". After we reached a decision on 1–b, we then considered 1–a.

Mr. Viertel was asked the following questions and he gave the following answers:

"Q All right. What, Mr. Viertel, if anything, did you say to the jurors with respect to answer to 1–b and its application to 1–a?

A We came to a unamious agreement on 1–b and then on 1–a. It was suggested after we voted on 1–b that since they did understand what they were doing there that it stood to reason that they were not unduly influenced in their giving the first $50,000.00.

Q And then did you answer Special Issue No. 1–a?

A Yes, we did.

Q In the manner in which it reads there.

A Yes, sir.

Q What is that answer?

A No.

Q In connection with this agreement you testified to, did you as foreman of the jury make any statement to the jury that this was the proper procedure, or that is to say, having answered that they did understand that they weren't unduly influenced?

A Yes, sir."

⸱  ⸱  ⸱  ⸱  ⸱  ⸱

"Q Did any of the jurors object to that observation or statement made by you?

A To my recollection there was no objection."

After this we moved to special issues 2–a and 2–b, we were not able to answer 2–a and we moved to 2–b and considered it. There was a great deal of discussion in regard to this issue. We arrived at a unanimous answer to issue 2–b and answered it "they did not understand" and then we went back to 2–a and it was suggested that since they did not understand what they were doing on 2–b then probably our answer would have to be yes to special issue 2–a. After we had answered 2–b, I made a statement to the jury again that if we answered 2–b "they did not understand", we would have to answer 2–a that they were unduly influenced and no objection was voiced to that statement. The jury adopted that procedure. We answered 3–b first and we followed much the same procedure that we followed on special issue 2–b and 2–a. We unanimously answered 3–b that "they did not understand" and then went to 3–a and the same procedure and same reasoning was used and found they were under undue influence. We thereafter answered 4–b and then answered 4–a. We then considered issues 5–a and 5–b and we answered them in the same manner. We answered 5–b first. Our answer to 5–b was that "they did not understand". We then answered issue 5–a "yes". I believe that after we answered 5–b, I stated that if they did not understand at that time, they must have been under undue influence. I made this statement as to how we would have to answer 5–a, and no objection was raised by any juror that I recall.

In Volume 40 of the Texas Law Review (1962) at page 849, Associate Justice, Jack Pope, of the Texas Supreme Court has written an article on "The Mental Operations of Jurors". In this article he says:

"The line at which thought becomes act is vaporous. To declare that jurors may reveal their overt acts but not their mental processes may state the rule; but jurors, attorneys, witnesses, and judges alike find difficulty in distinguishing the two. The difficulty comes down to this: speech is an overt act; thought is not; yet speech is thought. The manner in which the Supreme Court of Texas treats overt acts is well illustrated by Triangle Cab Co. v. Taylor, 144 Tex. 568, 192 S.W.2d 143 (1946)."

Mr. Viertel's statement "I made a statement to the jury again that if we answered 2–b 'they did not understand', we would have to answer 2–a that they were unduly influenced", is an overt act of misconduct because it directs the jury in answering the issue to adopt a standard different from the one prescribed in the Court's charge. This same reasoning and this same procedure was followed in answering all of the undue influence issues. If such misconduct be material, and it reasonably appears from the evidence at the hearing on the motion and the trial of the case and from the record as a whole that injury probably resulted, reversible error has been shown.

The same procedure was followed by the jury in answering all the undue influence issues. The first two were favorable to the Museum and the others were not. In my opinion any error of jury misconduct was harmless. Rule 434, T.R.C.P.

The record establishes that all the Museum's preliminary negotiations regarding the cash contributions, the deeds and the trust instrument were conducted with the brother, S. T. Swenson. However, some of the Museum's officers were present at the time the sisters signed the checks and the instruments. The Swensons contend that a fiduciary relationship existed between them and their brother because he was operating under a power of attorney, which gave him broad powers in the management of their property. The power of attorney was executed in 1956. The Swenson sisters continued to sign all the documents relating to their land because the power of attorney was not recorded. They would execute the instruments only after seeking S. T.'s advice or approval. S. T. was one of the incorporators, vice-presidents and directors

of the museum. He was also one of the trustees in the Declaration of Trust. He and his wife were also beneficiaries of the trust.

The appellants say "it was undisputed here that a confidential relationship did exist between S. T. Swenson and his sisters, but the fact that he gained any dominion or control over their minds or wills with respect to the transactions in question was strenuously contested." This contested fact issue that was strenuously contested has been foreclosed against the appellants by the verdict.

S. T. and the Museum were beneficiaries of the gifts and the Trust Agreement. Having managed his sisters' property and business affairs since 1900 and operated as their agent under a power of attorney since 1956, S. T. was in a strategic position to assist the museum in these disputed transactions. We find some evidence of probative force that the Swenson girls did not understand the nature and consequences of these transactions which took practically all of the girls' money and all of their lands.

In Pomeroy's Equity Jurisprudence, Fourth Edition, § 956, at page 2038, we find the following:

" . . . We are now to view fiduciary relations under an entirely different aspect; there is no intentional concealment, no misrepresentation, no actual fraud. The doctrine to be examined arises from the very conception and existence of a fiduciary relation. While equity does not deny the possibility of valid transactions between the two parties, yet because every fiduciary relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and of thereby overcoming the presumption."

Section 957, at page 2042:

"There are two classes of cases to be considered, which are somewhat different in their external forms, and are governed by different special rules, and which still depend upon the single general principle. The first class includes all those instances in which the two parties consciously and intentionally deal and negotiate with each other, each knowingly taking a part in the transaction, and there results from their dealing some conveyance, or contract, or gift. To such cases the principle literally and directly applies. The transaction is not necessarily voidable, it may be valid; but a presumption of its invalidity arises, which can only be overcome, if at all, by clear evidence of good faith, of full knowledge, and of independent consent and action."

Archer v. Griffith, 390 S.W.2d 735 (Tex.Sup.1964), our Texas Supreme Court said:

"Petitioner insists that the trial court erred in setting aside the deed because there is no evidence of any fraud in connection with its execution and delivery. It was stipulated by the parties that the relationship of attorney and client existed between petitioner and respondent when the deed was executed and delivered. That fact has an important bearing on the controversy. The relation between an attorney and his client is highly fiduciary in nature, and their dealings with each other are subject to the same scrutiny, intendments and imputations as a transaction between an ordinary trustee and his cestui que trust. 'The burden of establishing its perfect fairness, adequacy, and equity, is thrown upon the attorney, upon the general rule, that he who bargains in a matter of advantage with a person, placing a confidence in him, is bound to show that a reasonable use has been made of that confidence; a rule applying equally to all persons standing in confidential rela-

tions with each other.' Story, Equity Jurisprudence, 7th ed. 1857, § 311. This principle has always been recognized by the Texas courts. Cooper v. Lee, 75 Tex. 114, 12 S.W. 483; Holland v. Brown, Tex.Civ.App., 66 S.W.2d 1095 (writ ref.); Bell v. Ramirez, Tex.Civ. App., 299 S.W. 655 (writ ref.).

The general rule mentioned above applies to a contract or other transaction relating to compensation provided the attorney-client relationship was in existence at the time. 'Although an attorney is not incapacitated from contracting with his client for compensation during the existence of the relation of attorney and client, and a fair and reasonable settlement of the compensation to be paid is valid and enforceable, if *executed freely, voluntarily, and with full understanding by the client*, the courts, because of the confidential relationship, scrutinize with jealously all contracts between them for compensation which are made while the relation exists. There is a presumption of unfairness or invalidity attaching to the contract, and the burden of showing its fairness and reasonableness is on the attorney.' Pomeroy, Equity Jurisprudence, 5th ed. 1941, § 960d." (emphasis added)

"A gift between persons occupying confidential relations toward each other is, if its validity is attacked, always jealously scrutinized by a court of equity, and unless found to have been made freely, voluntarily, and with a full understanding of the facts, will be invalidated." 38 Am.Jur.2d § 36 at page 838.

Also see Bohn v. Bohn, 455 S.W.2d 401 (Tex.Civ.App.—Houston 1970, dismissed).

The evidence establishes as a matter of law that a fiduciary relationship existed between S. T. and his sisters. In Archer v. Griffith, supra, the court announced the rule regarding attorney and client and then said "a rule applying equally to all persons standing in confidential relations with each other". We have findings that the Swenson sisters did not understand the nature and subject matter of the second contribution, the Deeds and the Declaration of Trust. The evidence and the findings are sufficient to support the judgment.

█ The jury found the answers to issues 6, 7 & 8 that the Swenson sisters did not place the two Deeds and the Declaration of Trust in the control of the Museum and the trustees with the intention that they should become operative as conveyances and as a Trust Agreement. The appellants contend the court erred in rendering judgment against them based on these answers because there is no evidence to support them. Stated another way, the appellants contend the evidence establishes conclusively or as a matter of law that the deeds and the Trust Agreement became operative. After executing the deeds and the Trust Agreement, the Swenson sisters continued to exercise all the incidents of ownership over their property the same as they did before the instruments were executed.

There is no evidence in the record that either of the girls manually handed the deeds and the Trust Agreement to the Museum or the Trustees. However, the Supreme Court in Vannerberg v. Anderson, 146 Tex. 302, 206 S.W.2d 217 (1947) said:

"Delivery, which is essential to effective conveyance, may be presumed, prima facie, from the fact that a deed has been filed for record. Koppelmann v. Koppelmann, 94 Tex. 40, 57 S.W. 570; Devlin on Real Estate (3d Ed.) Vol. 1, pp. 499–505, Sec. 292; 16 Am.Jur., pp. 655–656, Sec. 384; 26 C.J.S. Deeds § 187. But notwithstanding the filing of the deed for record (or even manual delivery to the grantee), the deed does not vest title in the grantee when it is shown that the grantor, at the time he executed and filed it for record (or placed it in the hands of the grantee), did not intend that it should become operative as a conveyance of the title."

See also Estes, Sr. v. Reding, 398 S.W.2d 148 (Tex.Civ.App.—El Paso 1965, ref. n. r. e.), and Thornton v. Rains, 157 Tex. 65, 299 S.W.2d 287 (1957).

S. T.'s testimony reveals that his sisters' land was conveyed to the Museum for a special purpose. It was conveyed to the Museum so it could use the lands as collateral.

In Austin Lake Estates Rec. Club v. Robert S. Gilliam, 493 S.W.2d 343 (Tex. Civ.App.—Austin 1973, writ ref'd n. r. e.), the court said:

> "The question of delivery of a deed is one of intention of the grantor." Taylor v. Sanford, 108 Tex. 340, 193 S.W. 661 (1917); Thornton v. Rains, 157 Tex. 65, 299 S.W.2d 287 (1957).

The appellants no evidence points relating to delivery are overruled.

■ The appellants contend the Court erred in failing to hold as a matter of law that the Swenson girls ratified the cash contribution, the deed, and the Declaration of Trust. It contends the evidence conclusively establishes ratification and estoppel. The jury found against the Museum on these issues. In Olds v. Traylor, 180 S. W.2d 511 (Tex.Civ.App.—Waco 1944, writ ref'd), the court stated:

> "Where the facts are controverted, or are such that different inferences may be reasonably drawn therefrom, an issue of fact is raised; it is only where the evidence is harmonious and consistent, and the circumstances permit of but one conclusion, that the question becomes one of law for the determination of the court. An issue of fact is raised 'if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff.'"

We hold the facts on ratification and estoppel were controverted and issues of fact thereon were properly submitted to the jury. The museum's points relating to ratification and estoppel are overruled.

I have considered all of Appellants' one hundred and ninety-two points of error and find no merit in them. Appellees' cross-points have been considered and overruled.

The judgment is affirmed.

McCLOUD, Chief Justice (concurring).

I concur because of the jury's answers to Special Issues No. 2–B, 3–B, 4–B, 5–B, and 6.

The jury found in answer to Special Issues No. 2–B, 3–B, 4–B, and 5–B, the Swenson sisters did not understand the nature and subject matter of the respective transactions and the consequences of their acts. I agree the evidence established as a matter of law that a fiduciary or confidential relation existed between S. T. Swenson and his sisters, Clara J. Swenson and Alma B. Swenson. It must be kept in mind that the transactions involved a confidential relationship and an inter vivos gift. I think under the facts of this case, Special Issues No. 2–B, 3–B, 4–B, and 5–B, were ultimate and controlling issues, there was some evidence to support the jury's findings, the evidence was not factually insufficient to support the findings, and the answers were not so against the overwhelming weight and preponderance of the evidence as to be manifestly unjust. Archer v. Griffith, 390 S.W.2d 735 (Tex.Sup.1964); Bohn v. Bohn, 455 S.W.2d 401 (Tex.Civ.App.—Houston (1st Dist.) 1970, writ dism.).

In answer to Special Issue No. 6 the jury found that the Swenson sisters did not place the deed dated July 14, 1970, conveying 1761 acres of land to the Stephens County Museum, Inc., in control of Stephens County Museum, Inc., with the intention that it should become operative as a conveyance of the land therein described.

There is evidence in the record that the conveyance was for a special purpose. I am of the opinion there is some evidence to support the jury finding, the evidence is not factually insufficient to support the finding and the finding is not so against the overwhelming weight and preponderance of the evidence as to be manifestly unjust.

I do not agree that the judgment of the trial court can also be affirmed based upon the jury's answers to Special Issues 2-A, 3-A, 4-A, 5-A, 7, and 8, in view of the appellants' objections and exceptions to the charge, the misconduct of the jury, and the evidence contained in the record.

In Special Issue 2-A, the jury was asked to find whether at the time the Swenson sisters made the "second contribution of approximately $50,000.00 to Stephens County Museum, Inc.," they were acting under undue influence. Appellant, Museum, objected and excepted to such issue on the grounds that the second $50,000.00 contribution was made up of various checks given at different times and dates and the issue as submitted requested the jury to find the existence or nonexistence of undue influence with respect to the aggregate of such respective contributions when if broken down as to each individual contribution they could find the absence of undue influence with respect to one or more of such individual checks. The Museum further pointed out that as framed the issue constituted a comment upon the evidence. In my opinion the objection was valid. The evidence showed that the second contribution of "approximately $50,-000" consisted of a series of checks given at different times. The issue as framed required the jury to find all of the $50,000.00 was given as a result of undue influence or all of it was not. The issue constituted a comment on the weight of the evidence. Rule 272, T.R.C.P.; Johnson v. Zurich General Accident and Liability Insurance Company, 146 Tex. 232, 205 S.W.2d 353 (1947).

Appellants objected and excepted to Special Issues No. 2-A, 3-A, 4-A, and 5-A because the issues failed to inquire as to the name or identity of the party or parties who may have exerted the undue influence and as worded the jury was permitted to speculate and find the existence of undue influence by persons unknown to and unconnected with any of the defendants in the case and unconnected with any of the evidence in the cause. I agree that the issue was too general and global. I fail to find any evidence of undue influence exerted by any person other than S. T. Swenson. The undue influence issues should have included by either name or capacity the party or parties who allegedly exerted such undue influence.

Appellants contend material jury misconduct occurred insofar as the undue influence issues are concerned. I agree. The testimony of the jury foreman establishes, without contradiction, the jury substituted its own definition of what constituted undue influence for the definition given by the court.

The jury found in answer to Special Issues No. 7 and 8 that the Swenson sisters did not place the deed conveying approximately 5777 acres of land to the trustees, and the declaration of trust, in the control of the trustees with the intention that the instruments should become operative. The trustees contend there is no evidence to support these findings. I agree.

The record reflects that the deed conveying approximately 5777 acres of land to the trustees and the declaration of trust were placed in the hands of the trustees after the instruments were executed by appellees. There is no evidence in my opinion that these two instruments were given to the trustees for any special purpose. I do not think the rule announced in Thornton v. Rains, 157 Tex. 65, 299 S.W.2d 287 (1957) and Vannerberg v. Anderson, 146 Tex. 302, 206 S.W.2d 217 (1947) is applicable. In those cases the deeds were never placed in the hands of the grantees. Here,

the deeds were placed in the hands of the grantees and there was no evidence of any reservation, restriction or special purpose. I think the proper rule to be applied is found in 19 Tex.Jur.2d § 88, page 368, where it is stated:

"If a grantor places a deed in the hands of the grantee, except for some special purpose, the law conclusively presumes that he intended it to become operative as a conveyance, and the delivery is complete and valid unless accident, mistake, fraud, or some similar ground for relief exists."

See also McClendon v. Brockett, 32 Tex. Civ.App. 150, 73 S.W. 854 (1903, writ ref.); Johnson v. Masterson, 193 S.W. 201 (Tex.Civ.App.1917, writ ref.).

If it were not for the jury's answers to Special Issues No. 2–B, 3–B, 4–B, 5–B, and 6, I would reverse and remand the case. However, in view of the jury's answers to Special Issues No. 2–B, 3–B, 4–B, 4–B, and 6, I am of the opinion that the judgment of the trial court should be affirmed. I also agree that appellees' cross-points should be overruled because there is some evidence to support the answers of the jury to Special Issues No. 1–A and 1–B.

RALEIGH BROWN, Justice (dissenting).

I join Chief Justice McCloud in his concurring opinion as to all matters except his agreement that Special Issues No. 2–B, 3–B, 4–B, and 5–B, are ultimate and controlling issues. In so holding, the majority opinion concludes the findings that the Plaintiff sisters "did not understand" require setting aside the transactions inquired of in the designated issues. I cannot agree and respectfully dissent.

In the case at bar the Plaintiff sisters do not plead or suggest in the trial any mental incapacity on their part. There is no finding of fraud, accident, mutual mistake or misrepresentation of facts by anyone involved in the transactions in question. I am of the opinion that the improper submission of Special Issues No. 2–A, 3–A, 4–A, and 5–A and the material misconduct of the jury constitute reversible error and vitiates the findings as to undue influence. Therefore to prevail, the Plaintiff sisters must establish a breach of the confidential relationship existing between them and S. T. Swenson.

The quotations from Pomeroy, American Jurisprudence 2d, the Archer case, and the cited Bohn case in the majority opinion clearly announce the rules of substantive law concerning dealings between persons occupying confidential and fiduciary relations toward each other. (Case law suggests the possibility of different degrees of duty on the part of the person in whom the confidence is reposed in different confidential relation situations. I shall refrain from making such distinctions here even though the question does arise, is S. T. the sisters' agent, their advisor or only a trusted brother.) Without doubt equity raises a presumption against the validity of such transactions and requires before the presumption can be overcome "clear evidence of good faith, of full knowledge and of independent consent and action", "its perfect fairness, adequacy and equity", "and unless found to have been made freely, voluntarily and with a full understanding of the facts, will be invalidated."

The effect of the presumption in Texas is stated in McCormick & Ray, Texas Law of Evidence, Section 57, as follows:

"Under the more generally accepted view (and the Texas view) that the sole effect of a presumption is to fix the burden of producing evidence, obviously presumptions are nothing more than rules for the guidance of the trial judge in locating the burden at a particular time. The Court first has to determine whether the opponent has produced sufficient evidence to support a finding of the non-existence of the presumed fact; if so, the case will proceed as if no one had ever heard of the presumption."

There are innumerable Texas cases cited by the treatise in support of the proposition.

Since the confidential relationship existed, the Plaintiff sisters had the presumption of the invalidity or unfairness of the transactions in their favor. Appellants then produced evidence showing the sisters had competent, independent legal advice, that the transactions were fully explained to them and that they asked questions concerning each prior to executing any instruments putting into effect the transactions. Evidence showed the Plaintiff sisters as being strong-willed persons who enjoyed the ceremonies surrounding the execution of the instruments and appreciated the fact a museum would be named in honor of their family. Witnesses testified the sisters exhibited much excitement anticipating the construction of the museum and of placing items of history from their home in it. Neither sister ever testified S. T. Swenson failed to explain the instruments to them or deceived them. The record reflects that S. T. assisted his sisters in their affairs for more than forty years without violating a confidence. Therefore the appellants discharged their burden of producing evidence and the Plaintiff sisters must shoulder the burden of establishing the invalidity of the transactions by showing a breach of the confidential relationship by S. T. Swenson.

Our problem then becomes what is the proper submission of the case under our special issue practice. We must adhere to the proper substantive law but we must not do violence to the appropriate rules regarding submission of a case on special issues. Only ultimate, controlling issues are to be submitted, not evidentiary issues. Leeder et al. v. Leeder et al., 161 S.W.2d 1112 (Tex.Civ.App.—San Antonio 1942, writ ref.); Glass v. Upton et al., 226 S.W.2d 244 (Tex.Civ.App.—Austin 1950, no writ history); Rule 279, Texas Rules of Civil Procedure.

Our Supreme Court in the Archer case quotes:

"The burden of establishing its perfect fairness, adequacy, and equity is thrown upon the attorney, upon the general rule, that he who bargains in a matter of advantage with a person placing a confidence in him, is bound to show that a reasonable use has been made of the confidence."

The Bohn case states "The donee must show from the circumstances surrounding the making of the gift that it was fair and equitable."

An inquiry of whether the Plaintiff sisters knew and understood appears to me to be an inquiry as to their mental capacity and there is no pleading or proof of mental incapacity in the case at bar. The Bohn case says the finding must be that "the gift was fair and equitable". The Archer case says "that a reasonable use has been made of the confidence" is the test. Under neither case could the inquiry of whether the sisters knew and understood be anything other than evidentiary and thus would not support a judgment. Simmons Motor Company v. Mosley, 379 S.W.2d 711 (Tex. Civ.App.—Austin 1964, writ ref. n. r. e.).

Whether the plaintiff sisters executed the instruments voluntarily or whether they acted freely, or whether they had independent legal advice, or whether they had full knowledge, or whether a full disclosure was made to them, or whether they understood, and similar inquiries are evidentiary matters as to "fairness, adequacy and equity" of the transactions and are not ultimate and controlling issues.

In the case at bar mentally competent persons seek to set aside their transactions without proper findings of fraud, accident, mutual mistake, misrepresentation of facts or undue influence. Their recovery is predicated upon a breach of a confidential relationship. I must conclude under such circumstances and the applicable substan-

tive law a proper submission, as indicated in the Archer case, would inquire as to S. T. Swenson's failure to make a reasonable use of the confidence imposed in him with an appropriate instruction as to the duty of such a confident. Such an inquiry would properly place the burden of proof and ask the ultimate controlling issue.

I agree with the overruling of appellees' cross-points. There being no proper delivery of the instrument conveying the 1761 acres of land to the Stephens County Museum, Inc., I would affirm that portion of the judgment of the trial court. In all other matters, I would reverse the judgment and remand the cause.